(No. 69993.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. WILLIAM P. LEGER, JR., Appellant.

*Opinion filed July 30, 1992.*

358

MILLER, C.J., and HEIPLE, J., concurring in part and dissenting in part.

Charles M. Schiedel, Deputy Defender, of Springfield, and Steven Clark, Assistant Appellate Defender, of Chicago, both of the Office of the State Appellate Defender, for appellant.

Roland W. Burris, Attorney General, of Springfield (Rosalyn B. Kaplan, Solicitor General, and Terence M. Madsen and Marcia L. Friedl, Assistant Attorneys General, of Chicago, of counsel), for the People.

JUSTICE FREEMAN delivered the opinion of the court:

On September 8, 1987, defendant, William P. Leger, Jr., was charged by information with three counts of first degree murder, one count each of attempt to commit first degree murder, home invasion, and armed violence, and two counts of aggravated battery, in violation of the Criminal Code of 1961 (Ill. Rev. Stat. 1985, ch. 38, pars. 9—1(a)(1), (a)(2), (a)(3), 8—4(a), 33A—2, 12—4(a), (b)(1)). On May 12, 1988, a ninth count was added, charging first degree murder committed in the course of another felony (Ill. Rev. Stat. 1985, ch. 38, par. 12—11(a)(2)). After a jury trial in the circuit court of Saline County, defendant was convicted on all counts. Defendant waived his right to a jury at his sentencing hearing, and the trial court sentenced defendant to concurrent 30-year prison terms for attempted murder and home invasion. The court did not sentence defendant for the aggravated battery and armed violence convictions, as those convictions merged into the attempted murder conviction. The court found defendant eligible for the death penalty based upon the murder convictions and the findings that defendant was at least 18 years old at the time of the offenses, and there existed one or more of the factors set forth in section 9—1(b) of the Criminal Code of 1961 (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(b)).

At the second stage of the sentencing hearing, the trial court found no mitigating factors sufficient to preclude imposition of the death penalty. The trial court then sentenced defendant to death. The sentence was stayed (134 Ill. 2d R. 609(a)) pending direct appeal to this court (Ill. Const. 1970, art. VI, §4(b); Ill. Rev. Stat. 1985, ch. 38, par. 9—1(i); 134 Ill. 2d R. 603). We affirm defendant's convictions, vacate the death sentence, and impose a term of natural life imprisonment.

Defendant raises the following issues on appeal: (1) a juror's friendship with the surviving victim and the juror's daughter's friendship with the deceased victim's daughter violated defendant's right to an impartial jury; (2) defendant's history of alcoholism and alcohol blackouts, use of prescription drugs, intoxication on the night of the murders, and lack of memory of his actions when sober established that defendant was so intoxicated and drugged that he lacked the mental states required for the offenses for which he was convicted; (3) the prosecutor's opening statement improperly suggested that defendant's trial was a mere formality; (4) a police trooper's testimony that defendant "didn't want to talk" after informed of his *Miranda* rights violated defendant's fifth amendment and due process rights; (5) the prosecutor's closing argument improperly attempted to shift the burden of proof, sought to frighten the jurors, and urged retribution, thus denying defendant a fair trial; (6) jury instructions erroneously stated the elements of attempted murder as requiring intent to commit murder instead of intent to kill; (7) defendant's waiver of a jury for sentencing was not made knowingly and intelligently where the trial court incorrectly advised defendant that the jury's decision regarding a death sentence or prison sentence must be unanimous; (8) defendant's death sentence is excessive where the offense resulted from marital, emotional, and drinking problems, and defendant's

background included excellent military and work records, serious medical problems, and no significant criminal history; (9) defendant was denied effective assistance of counsel at sentencing where counsel failed to move to suppress a statement which had been improperly obtained and used in aggravation; (10) the Illinois death penalty statute violates the eighth and fourteenth amendments because it places a burden of proof on defendant which precludes meaningful consideration of mitigation; (11) the death penalty statute is unconstitutional because it does not sufficiently minimize the risk of arbitrarily or capriciously imposed death sentences.

## FACTS

Defendant was charged with the murder of Susan Newman, his former wife, and the attempted murder of Monte Newman, Susan's husband. At trial, the court allowed evidence also of defendant's alleged murder in Gallatin County of his estranged wife, Mary, who was killed on the night the offenses in the instant case were committed. The evidence regarding Mary's death was admitted for the limited purpose of showing defendant's motive that night. Defendant raised an affirmative defense of voluntary intoxication.

The State called Monte Newman, who testified that on the night of September 4, 1987, he was at home in Eldorado, Illinois, with Susan, to whom he had been married since July 1985. Kim Leger, Susan's daughter and Newman's step-daughter, also lived at the home, but was out for the evening. Newman and Susan left the front door unlocked for Kim's return.

Around 11 p.m., Newman and Susan were asleep when he was awakened when Susan moved. She then said, "What are you doing in here, you're not supposed to be in here[,] Bill." Newman stated that defendant had entered the bedroom and then came towards the bed and

shot Susan. As Newman attempted to get off the bed, defendant shot Newman in the side, knocking him off the bed. Defendant then shot Newman in the toe, and shot Susan two more times. Newman again attempted to get up. He picked up a basket of books and threw it at defendant. Defendant then shot Newman in the head, as defendant said, "As for you ***." Newman stated that he had not given defendant permission to enter the house.

Defendant's parents, Dorothy Leger and William Leger, Sr., also were called by the State to testify. Dorothy Leger testified that on September 4, 1987, after 10:30 p.m., defendant came to her home in Eldorado asking for some of his father's pain pills. She noticed blood on defendant's shirt and said, "You've been in a fight." Defendant stated, "I killed those two whores and that man." Dorothy testified that her husband then said to defendant, "Oh, you're crazy, you're drunk." Defendant did not reply. Defendant then went outside and came back in with a gun, which he then left at his parents' home. Defendant then began talking about seeing children killed in Viet Nam when he was there. Defendant then said to his father, "Daddy[,] don't do my mommy that a way," and walked out of the home. Dorothy walked after him and asked him to stay, because she "didn't believe it, and he was wild looking." Defendant said to his mother, "Mommy, I love you," and drove off. Dorothy stated that about one week prior to September 4, her son had talked to her about marital problems he was having with Mary.

On cross-examination, Dorothy testified that on the night of September 4, defendant had remained at her home for 30 to 45 minutes. During that time, he "acted weird" but did not seem eager to leave. Dorothy stated that defendant's appearance was substantially different

that evening than it had been in the morning, when he looked "like he does now."

William Leger, Sr., also testified. William Sr.'s testimony corroborated that of Dorothy regarding the events of September 4, 1987. On cross-examination, William Sr. testified that he "knew there was something wrong with [defendant.] I've never seen him look like that, that wild, I just thought he was on a wild drunk *** and *** he acted very strange to me." William Sr. also said that he had been drunk with his son "a few times" and had "seen him act that way."

The State also called Village of Galatia police officer Joe Aikens, who had arrested defendant. Shortly after 11 p.m. on September 4, 1987, Aikens, responding to a dispatched call, observed defendant's vehicle traveling "slower than the normal speed." Defendant's vehicle soon pulled off the road and stopped. Defendant got out of the car, identified himself in response to Aikens' question, and Aikens arrested him. Defendant offered no resistance. While Aikens and defendant waited in the squad car for other police officers to arrive, defendant told Aikens to be sure that the police knew that he was the one whom defendant "let catch him" because it might "do [Aikens] some good."

On cross-examination, Aikens testified that he did not use the exterior lights on the squad car when following defendant. Defendant's car was traveling 40 to 45 miles per hour in a 55-mile-per-hour zone. When arresting defendant, Aikens believed that defendant was intoxicated.

Defendant also testified. He stated that he enlisted in the United States Air Force and served from February 1965 through October 1968, including 12 months in Viet Nam. He achieved the rank of sergeant. Defendant worked for Peabody Coal Company until May 1987, when he began having back trouble resulting from a seri-

ous leg injury he had sustained in a mine. Defendant had injured his back in 1976 and had spinal fusion surgery in 1978. Again in October 1983 and in December 1983, defendant underwent additional back surgeries.

On the date of the offenses, defendant was taking 10 prescription medications for pain relief and other conditions. He had been taking the medications for six years. Since the offenses, he was taken off of those medications which contained codeine and barbiturate substances. Defendant testified that in early September 1987, he was drinking alcoholic beverages usually daily. He went for treatment for alcohol abuse in 1984. He had become a heavy drinker and was having periods of blackouts. Also at that time, a divorce from Mary was pending. The divorce was to be completed on September 9.

On Friday, September 4, the date of the offenses, defendant was living in Ridgway. He arose in the morning, took his medication and later that morning went for physical therapy. He then went to his parents' house, where the three discussed their plans for that evening and the next day. Defendant returned to Ridgway and did some errands. Around 1:30 p.m., defendant went to the Knights of Columbus "KC" hall bar in Ridgway and drank a beer. After 30 to 40 minutes, he returned home and then went again to the KC hall and had another beer. He then went to an American Legion hall, but not seeing anyone he knew, he returned to the KC hall and had another beer. Then he returned home and drank a double shot of bourbon.

Defendant stated that while he was at home, the telephone rang and it was his wife, Mary, who asked where he had been all week because he had not been in Ridgway. Defendant stated that when Mary asked him what he had been doing, he told her that it did not concern her and hung up the phone. Defendant explained at trial that during that week, he had taken his mother to

bingo a couple of times and had spent the night at his parents' home. He would wait until late in the evening to come home because he knew his divorce was coming up during the following week and he did not want to have any problems. After his telephone conversation with Mary that afternoon, defendant returned to the Legion hall, where he had a beer. Defendant returned to the KC hall, where he had another beer.

Defendant testified that after being at the KC hall, he did not remember what happened that evening. The next thing he remembered was being in jail on a Saturday. He remembered being moved from one cell to another, but he did not remember speaking to anyone. Defendant stated that he first learned that Susan was deceased when, while he was being brought from his cell to court on the Tuesday after Labor Day, someone told him that he had killed a woman.

Defendant stated that other than the approximately five beers and the double shot of bourbon he drank, he did not drink anything else on September 4, 1987. Defendant stated that he did not have any intention, or did not recall having any intention, to hurt or kill any person. Defendant also stated that he did not recall going to his parents' home that night or having the conversation to which they testified.

On cross-examination, defendant stated that on September 4, he returned to the KC hall about 6:30 p.m. He traveled between places in his automobile. He did not remember passing out. He did not remember leaving the hall. He did not recall going to Mary's house, talking to Officer Aikens, or buying gasoline before his arrest near Galatia. He stated that he had carried a gun before; however, he did not carry a gun that evening. Defendant testified that he was not mad at Mary Leger after speaking with her on the telephone; it merely was none of her business where defendant had been, because their

divorce was scheduled for the next week. Defendant also stated that he was not mad at Susan.

Edith Frederica Garnett testified that she had been the director of mental health and the youth service program at Egyptian Health Department since 1986. Garnett interviewed defendant in jail on September 5, 1987. When she asked questions regarding his age, the date, and his place of employment, defendant "was very related to those types of issues." However, when asked about what had happened and why he was in jail, defendant spoke in the past, never discussed what had actually happened, or answered questions in a rambling manner, and not in complete sentences. Garnett did not ask defendant specifically what had happened; she merely asked him why he was in jail.

Garnett stated that defendant was confused and was not completely aware of what was going on around him. He "seemed in a daze," unaware of what he had done. Defendant told Garnett that he had been married twice and talked of some anger towards his wives. However, defendant never talked about being in his car or going into the homes of his wives.

The defense called, among other witnesses, Myra Jean Moore, a drug-alcohol expert. Moore was the director of the alcohol program at Egyptian Health Department, and a registered nurse and certified addictions counselor who had counseled defendant in December 1984. In rebuttal, and in response to defendant's intoxication defense, the prosecution called Elizabeth Auld, a physician board-certified in psychiatry and neurology, as its expert in psychiatry. Auld interviewed defendant on February 22, March 17, and April 1, 1988.

Both Moore and Auld testified regarding an "alcohol blackout." Moore defined the term as a time during which a person who has been drinking does not remember what is happening; it is a type of amnesia. The per-

son does not pass out, but continues to function in the manner which would be normal behavior for the person during his period of drinking. Alcohol blackouts may last a few minutes, several hours, even days. Moore stated that research is not specific as to the cause of an alcoholic blackout, but the condition has to do with the way memory is stored in the brain. Short-term memory is affected by the alcohol, and what is stored in short-term memory is not transferred to long-term memory. A person can be in an alcohol blackout and still behave normally, and conduct day-to-day activities activities such as driving a car, because his short-term memory remains intact. The amount of alcohol or alcohol and drug required to induce an alcoholic blackout depends on the individual person.

Moore and Auld testified regarding the 10 medications defendant had been taking at the time of the offenses. Tolectin is a medication given for arthritis. Sinequan is an anti-depressant used for high anxiety or to produce sleep. Florinal is a barbiturate pain reliever. Zantac is for ulcers. Xanax is an anti-depressant, anti-anxiety drug which is habit-forming and is a controlled substance. Librax is a tranquilizer which is a derivative of librium and is very similar to Xanax. Reglan is a stomach medication. Dyazide is a diuretic, also used for high blood pressure. Flexeril is a muscle relaxer. Tylenol #4 is a combination of an analgesic medication and codeine, and could cause drowsiness, nausea, light-headedness, or dizziness. Auld and Moore stated that a number of these medications could interfere with a person's ability to reason. Moore noted that alcohol is a depressant.

Moore stated that the use of more than one drug together enhances the effect of the other so that there is more than a "one-plus-one" effect. The multiple effect is not always the same every time the drugs are taken together. Moore stated that a combination of Sinequan,

Xanax, Tylenol with codeine, Librax, and Flexeril would produce a multiple effect. Adding two beers to those drugs would combine and "greatly enhance" the effect.

Moore stated that behavior itself does not indicate if a person was drinking or not because the person could do something and never remember it if he were in a blackout. Moore stated that she would not necessarily expect a person to do something extraordinary during a blackout. Moore stated that the only way she would know that person is having a blackout is if, later, the person told her that he did not remember anything of what had happened.

Auld stated that whether a person would do acts of violence during a blackout is a subject under much investigation and is surrounded by a lot of controversy. The general belief is that most violent acts are immediate acts, performed on basic provocation, where, for example, a person is approached in a threatening manner and then retaliates by being violent. Auld stated that it was very rare for a person to commit violent acts while having an amnesia experience.

In response to questions by the prosecutor, Moore also testified that a person could, during an alcohol blackout, shoot someone, unload the gun, get in a car and drive 20 miles, reload the gun and then shoot two other people, before leaving that house and proceeding to drive and buy gasoline and then drive off. In response to similar questions, Auld testified that she did not believe that a person would be suffering from amnesic experience under those circumstances. Both Auld and Moore stated that it was possible that defendant could have consumed alcohol and other substances and performed certain activities in Ridgway and murdered his wife in Galatia and not know anything about it.

At the close of trial, defendant was convicted on all counts charged in the information.

Defendant waived a jury at sentencing. At the first stage of the sentencing hearing, the trial court found that defendant was eligible for the death penalty for murder committed in the course of home invasion, another felony.

At the aggravation and mitigation stage of the sentencing hearing, the State introduced a 1986 protective order directing defendant to refrain from physical and mental harassment of Mary Leger and an April 1984 battery conviction. Also admitted was an order of protection against the defendant entered during the dissolution of marriage proceedings between defendant and Susan Leger.

Carl Horn, a Ridgway police officer, testified in aggravation that he had been called to the residence of defendant and his wife Mary six or seven times for domestic disputes. Horn stated that at those times, he observed bruises on Mary and that defendant had been drinking.

Russell Helton, a minister in the Calvary Baptist Church, testified that he knew defendant and Susan Leger through his ministry. Helton stated that defendant had threatened to kill him when he was counseling Susan Leger during the divorce proceedings.

Billie Sue Cullison, defendant's daughter, testified that one evening in May 1983, when she was 16 years old and after her mother, Susan Newman, was divorced from defendant, defendant came to their home with a gun in his hand. Defendant had been drinking. Twice that evening, defendant held the gun to Susan's head and threatened to kill her, and Billie Sue pushed defendant away and lay on top of her mother to protect her. Billie Sue then convinced defendant to allow her to drive him to the motel where he was staying. Billie Sue stated that after that incident, she and her mother went to Ohio to stay with her grandmother.

On cross-examination, Billie Sue testified that her parents had fought often. Even after the incident in 1983, until May 1987, she continued to write letters to her father, in which she told him that she loved him.

Zack Gibbons, a deputy jail officer, testified that after defendant's arrest, while in the booking room cell, defendant and he were discussing defendant's problems with Susan at the time of their divorce. Defendant then stated that he wished Monte Newman had died also. Gibbons testified that defendant then stated that he should not have said that about Newman.

In mitigation, defendant called a number of witnesses to testify. Raymond Lawler, an attorney who had represented defendant in worker's compensation matters, testified that between 1980 and 1987, defendant appeared to be suffering from anxiety depression. He stated that defendant's family was receiving temporary total disability compensation because of defendant's injuries and inability to work, and that, at the time of trial, defendant still had a claim pending based on his third back surgery.

Lawler stated that defendant would continue to return to work after he filed compensation claims. Whenever he would return to work, defendant's back condition would be aggravated. Lawler saw defendant become angry because he had to travel to different doctors and his medications were not paid for. Lawler stated, however, that defendant was always a gentleman, and never made threats or showed hostility. Defendant did not complain, but Lawler could see that defendant was in pain, because his hands would shake, he smoked continuously, and he was unsteady.

Kenneth Miracle, a coal mine supervisor, testified that he had known defendant since he was a teenager, and was a friend of the Leger family. Miracle stated that defendant never gave him any problems on the job, and Miracle was unaware of any work-related problems of

defendant with anyone. He never knew defendant to be violent or lose his temper. Miracle stated that after defendant's mine accident in 1970, defendant was "not the same Bill Leger that I knew." Defendant seemed to be in severe pain and have a lot on his mind, including his health problems. Miracle did observe defendant's wife Mary come to the mine once or twice and observed at least once that defendant and she got into a heated discussion.

Randolph Stricklin testified that he had worked with defendant for 14 years. He stated that defendant had been "the finest [union] president we've had." Stricklin had observed that defendant was angry at Susan Leger regarding their divorce and about the property settlement and the attorneys handling the matter. Stricklin also was aware that defendant was having problems with Mary and that he was angry with Mary for taking a television set from him.

Mary Ann Yates, a registered nurse supervisor at Peabody Coal Company, testified that she had treated defendant for back and leg pain. Yates stated that the possible effects of the medications defendant took after his accident included confusion, hallucination, delusion, anxiety, and depression. Yates stated that defendant did not complain often and did not often discuss personal problems. Defendant, however, sometimes received telephone calls at work from Susan Newman or Mary Leger, after which his mood would change and sometimes he would become depressed or a little angry. Defendant did not call the women names or threaten them, nor did he become physically aggressive.

David Anglin, jail administrator for the Saline County sheriff's department, where defendant was incarcerated, stated that defendant had been a "model inmate" who had complied with all rules and caused no problems.

Dorothy Leger, defendant's mother, testified as to defendant's medical and marital problems. Dorothy Leger stated that the divorce proceedings relating to defendant's second marriage, his worker's compensation claim, and litigation regarding certain property issues related to his first marriage, all were pending at the same time. Defendant had told his mother that he loved Mary. Dorothy Leger stated that she observed defendant also show love for Susan Leger, because he would give her money when she asked. Dorothy Leger stated that she loved her son and believed that he posed no threat.

William P. Leger, Sr., testified that defendant had been a good son who never brought any trouble. He loved his son very much and did not feel threatened by him. He had never, before the night of the subject incident, heard defendant refer to either Susan or Mary as a "bitch" or a "whore." On the night of the incident, William Sr. did not believe what defendant told him and his wife about killing the women.

John Ewan testified that he had known defendant for 20 years and, between 1981 and 1983, rented the lower floor of his home to defendant. Defendant never exhibited any violence or loss of temper, and Ewan never observed any altercation between defendant and either Susan or Mary. Defendant was a soft-spoken man who was friendly, but shy. Ewan never felt threatened by defendant.

Defendant testified that he had worked in the underground mines until his 1970 injury. In 1972, his younger brother was killed in the mines. After his own accident, defendant returned to Peabody Coal Company, working aboveground in "washhouse maintenance." Defendant described the 1970 accident during which a shuttle car ran over his legs. Defendant stated that a shuttle car is used to haul coal and weighs approximately 10 tons. After the injury and initial surgeries, including skin grafts,

defendant underwent physical therapy. He was able to walk on his own about 1½ years after the accident.

After the accident, defendant was in continuous pain and his legs swelled. In 1976, defendant injured his back again when he was lifting some boxes at work. After being put in traction and being placed on medications during 1976 to 1978, defendant underwent back fusion surgery in 1978. Defendant returned to work in 1980, but then began having infections in his legs. He was hospitalized for a third surgery in December 1982.

Defendant stated that since 1982, he has been unable to have meaningful contact with his two daughters. Susan had obtained a court order restraining him from having any contact with his daughters. Billie Sue wrote letters to him, stating that she loved him, and sent him pictures of her daughter. Defendant attempted to arrange for visitation with his daughters but was unable to do so. Defendant stated that he loved his daughters. In September 1987, defendant was receiving $1,200 per month in worker's compensation. He paid $300 per month in child support in addition to his own expenses. Defendant stated that from 1974 to May 1988, he made payments on the home where Susan lived and where he and Susan had lived. During that time, the house remained in his and Susan's names. In June 1988, defendant signed over his interest in the house to his daughters.

Defendant stated that in 1984, he pleaded guilty to a battery charge based on his yelling at Susan. Defendant testified that he had not wanted to plead guilty, but he understood that in return, he would receive three months' probation, and he hoped that he could "get everything out of the way" and start seeing his children again. Defendant received three months' probation, which he successfully completed.

Defendant also stated that for his military service, he received an Air Force Commendation Medal for Service, a Commendation Medal from the Vietnamese government, and a Presidential Citation, National Defense Citation, Good Conduct Citation, and Marksmanship Citation. Defendant served as vice-president and secretary of his union at Peabody Coal, and also served as president of the union from 1981 through 1984.

Defendant testified that he spoke with jailer Zack Gibbons during the trial of the instant case. Gibbons asked defendant how things were going, and defendant responded that he could not talk about the trial. Gibbons stated that he wanted to let defendant know that he understood what he was going through because Gibbons was having problems with his wife. Defendant responded that he would not answer questions without his attorney and the sheriff being present. Defendant denied that he ever stated anything about wishing that Monte Newman were dead.

Defendant stated that the anger he felt regarding the divorce with Susan was directed toward the court system. He did not desire that Susan die, and stated that he is "sick" over her death and "cannot figure out" what happened, even after hearing the testimony at trial. Defendant reiterated that he did not recall what happened on September 4, 1987, after he went to the KC hall.

On cross-examination, defendant admitted to a 1987 arrest for disorderly conduct when he was drinking with a friend in a car. He denied threatening Reverend Helton, and stated that he merely told him to "get out" from between Susan and him when defendant and Susan were talking. Susan had told defendant that she did not want defendant to visit their younger daughter, Kim. Defendant denied hitting Susan or pointing a gun at her head. He also denied hitting his children. Defendant

stated that he had bought a gun two years prior to the incident because he planned on selling it to make some money.

Jackie Lee Smith testified that he had known defendant for 20 years from work and social contact. Smith stated that he never saw defendant exhibit any violence or threaten anyone. He never heard defendant refer to Susan or anyone else in derogatory terms. Smith stated that defendant was a good worker who got along with everyone. In addition, defendant was a good union president who helped everybody. Smith stated that he observed that defendant's injuries left him in pain. Smith stated that he was not afraid of defendant "at all."

In rebuttal, the State called defendant's daughter, Billie Sue Cullison. Billie Sue testified that she had seen defendant beat Susan, her mother, many times. He pushed, hit, kicked, choked her, twisted her arm and threw her down. Billie Sue recalled that kind of conduct from the time she was 3 years old until she was 14. Billie Sue left Saline County at age 17 when she got married. Billie Sue stated that defendant never hit her or her sister, Kim. Billie Sue stated that her mother encouraged her and her sister to visit defendant, and never kept them away from him.

Billie Sue stated that she received a letter on September 1, 1987, from her father in which he stated that he still loved Susan and that if Monte ever did anything to Susan he would kill him. Defendant's letter also stated that he had made a "mess" of his life and wished that he could go back and change things with Susan. Billie Sue stated that she was not aware that defendant had ever paid child support.

The presentence report indicated that Dr. Kenneth Goldstein, a clinical psychologist, saw defendant twice in February 1987 at the request of defendant's physician to help defendant deal with emotional problems related to a

deteriorating marriage. Goldstein reported that defendant was having a difficult time accepting the divorce, "with his major defense seeming to be withdrawal." The report also indicates that Goldstein found defendant to be disheartened and confused at the possibility of divorce, and that defendant's behaviors were reactivating memories of his first marriage in which he had similar problems. Defendant failed to keep a third appointment with Goldstein.

The presentence report also included a forensic report of Dr. Robert Chapman, M.D., who conducted a psychiatric evaluation of defendant on February 2, 1988. Chapman's report indicates that defendant's wide range of symptoms made him appear "defenseless," and that his symptomatic pattern showed chronic psychologic maladjustment. Defendant appeared rigid, stubborn, and angry at others. Defendant generally was self-controlled, disliked confrontation, and was unable to express anger "either openly or adaptively." The report stated that defendant took his first drink of alcohol at age four and remembered his first intoxication at age seven. Defendant maintained sobriety beginning in 1985 for almost a year.

At the close of the sentencing hearing, the trial court stated that it was considering the evidence adduced at trial, the presentence report, and the evidence at the sentencing hearing. With respect to the murder conviction and defendant's intoxication defense, the trial court distinguished *People v. Carlson* (1980), 79 Ill. 2d 564, in which a death sentence was vacated. The trial court noted that defendant's divorce from Susan had occurred in 1983, several years prior to the murder. Further, the court noted defendant's prior DUI conviction and two battery convictions. The trial court stated that it believed Billie Sue Cullison, Reverend Helton and others regarding defendant's criminal record. The trial court

also noted the testimony of Billie Sue that defendant held a gun to Susan Newman's head in May 1983, around the time of their divorce, and again at a later date when he was drunk and at which time he threatened to kill Susan. The trial court stated that this prior conduct of the defendant indicated that the September 4, 1987, incident was premeditated and "cold-blooded" and that defendant had intended to wait for the time he could kill Susan.

The trial court stated that the evidence did not indicate that defendant was acting under extreme mental or emotional distress at the time of the murders. The trial court rejected defendant's defense of amnesia blackout, and believed Dr. Auld, the State's expert. The trial court also stated that defendant's conduct and comments on the night of the murders indicated that defendant knew what he was doing. The trial court stated that the presence of one mitigating factor, such as extreme mental and emotional distress, did not necessarily preclude the imposition of the death penalty.

The court then found that there were no mitigating factors sufficient to preclude the imposition of the death penalty. The court stated that defendant's past conduct indicated that he could not be rehabilitated and he was a danger to society. The trial court acknowledged that defendant had physical problems and divorce problems. Further, the court stated that defendant showed remorse. However, the court stated that it believed Zack Gibbons' testimony that defendant had stated that he wished that Monte Newman had died.

The trial court found, pursuant to section 9—1(b) of the Criminal Code of 1961 (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(b)), that defendant was 18 years of age or older and that he had been found guilty of first degree murder. In addition, the murdered individual was killed in the course of another felony (Ill. Rev. Stat. 1985, ch. 38,

par. 9—1(b)(6)). Further, the murdered individual was actually killed by defendant in performing an act which caused the death of Susan Newman; defendant acted with intent to kill Susan Newman or with knowledge that his acts created a strong probability of death or great bodily harm to Susan Newman (Ill. Rev. Stat. 1985, ch. 38, pars. 9—1(b)(6)(a), (b)(6)(b)); that he was also convicted of one of the felonies listed in subsection (c) (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(b)(6)(c)), namely, home invasion. The trial court sentenced defendant to death.

## DISCUSSION

### I. Right to an Impartial Jury

Defendant initially contends that juror Billie Sue Graves' relationship with Monte Newman and Graves' daughter's friendship with Kim Leger, Susan Newman's daughter, resulted in a violation of defendant's sixth amendment right to an impartial jury. The trial court questioned Billie Sue Graves during *voir dire* proceedings:

"Q. [Trial court]: Okay. Billie, do you know any reason why you couldn't be fair and impartial as a juror in this case?

A. [Juror Graves]: The only reason that I know of that I wouldn't be is because I know Monte Newman.

Q. All right, and do you think that might cause you to be biased or prejudiced one way or the other?

A. No, not really. I just know him.

Q. Okay, how well do you know him? ***

A. He run around with my brother, you know, when they were younger.

Q. You, yourself, do you socialize with Mr. Newman?

A. We did—my husband and I did back when we first married but not for many years.

Q. How long ago has that been?

A. We've been married seventeen years, so I would say we have not associated with him for the last say ten years.

Q. All right. Is there anything about your knowledge of Mr. Newman that would cause you to be biased or prejudiced one way or the other?

A. No.

Q. All right, so at this point, then you wouldn't consider yourself as close friends.

A. No. Not at all."

In response to further questions regarding a list of potential witnesses, Graves stated that she had seen Kim Leger with her daughter:

"A. [Juror Graves]: She goes to school with her. My daughter has took her [Kim Leger] home from school and brought her by the house but I don't know her. I just, you know, she just introduced her to me.

Q. [Trial court]: You know who she is?

A. She told me she was Monte's step-daughter."

When the trial court asked counsel if they had questions of Graves, defense counsel stated:

"MS. ROCHFORD [Defense counsel]: Because she said that she and her husband had at one time visited with Monte Newman, would she have any difficulty if she finds the defendant not guilty as far as being able to come in contact with Monte Newman. Is that going to have any effect if they return a verdict of not guilty?

A. [Juror Graves]: No.

* * *

MS. ROCHFORD: Your Honor, she said that she is acquainted with Kim Leger. I would like to know if she has been a friend that has stayed overnight or—

A. No, she has never stayed overnight. She has come to the house. My daughter took her home from school and she came in with her along with another little girl, that my daughter knew. She came in the house and she told me who she was. That was the extent of it.

MS. ROCHFORD: I would like to know how recent this contact was?

A. That was after this all took place. It was before Christmas. It was, I would say, about October.

MS. ROCHFORD: I would like to know if she knows or if she knew Kim's mother?

A. No. Never met her."

Defense counsel moved to excuse Graves for cause, and the trial court denied the motion.

Defendant asserts that Graves' statements that she could be fair are contrary to human experience and common sense. The State responds that this court has declined to adopt a *per se* rule of disqualification in the context of familial relationships, citing *People v. Hyche* (1979), 77 Ill. 2d 229. The State asserts that the burden is on the party challenging the juror. Here, because Graves unequivocally testified that her ability to give an impartial verdict would not be compromised, the trial court properly denied defendant's challenge for cause.

In reply, defendant notes that Graves initially expressed concern about her ability to be impartial, and later stated that her knowing Monte Newman would not cause her to be biased or prejudiced. However, she did not specifically state that she would not be biased or prejudiced against defendant. Defendant asserts that Graves' statements fail to show that her concerns about being impartial were resolved. Defendant cites *People v. Porter* (1986), 111 Ill. 2d 386, in which this court, with three justices dissenting, held that the defendant had not shown that a prospective juror, who attended the same church as the victim's mother, was less than impartial. Defendant asserts that the instant case presents a "much stronger showing" of partiality than in *Porter*, because here the juror and her family had been friends of one of the victims and the juror's daughter was currently friendly with that victim's family. Defendant also contends that the State's reliance on *Hyche* is misplaced because the challenged juror, who was related to the

murder victim by marriage, was excused from the jury before deliberations began; whereas in the instant case, Graves was one of the jurors who signed the verdict form.

As the United States Supreme Court stated in *Irvin v. Dowd* (1961), 366 U.S. 717, 6 L. Ed. 2d 751, 81 S. Ct. 1639, "[T]he right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors. The failure to accord an accused a fair hearing violates even the minimal standards of due process." (*Irvin*, 366 U.S. at 722, 6 L. Ed. 2d at 755, 81 S. Ct. at 1642.) The Court further stated:

> " 'The theory of the law is that a juror who has formed an opinion cannot be impartial.' [Citation.]
>
> \*\*\* [However,] [t]o hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." (*Irvin*, 366 U.S. at 722-23, 6 L. Ed. 2d at 756, 81 S. Ct. at 1642-43, quoting *Reynolds v. United States* (1878), 98 U.S. 145, 155, 25 L. Ed. 244, 246.)

A trial court's findings regarding the impartiality of a prospective juror should not be set aside on appeal unless the error or prejudice is manifest. *Irvin*, 366 U.S. at 723, 6 L. Ed. 2d at 756, 81 S. Ct. at 1643; see also *People v. Porter* (1986), 111 Ill. 2d 386.

This court in *People v. Cole* (1973), 54 Ill. 2d 401, noted that the determination of the impartiality of a prospective juror is not purely an objective determination, but is to be made by the trial court based on its consideration of the juror's statement as evidence of the juror's state of mind, given the weight to which it is entitled under the circumstances. *Cole*, 54 Ill. 2d at 414.

We find that the trial court's determination as to the impartiality of juror Graves is supported by the record (*Cole*, 54 Ill. 2d 401), and we find no manifest error. First, the record does not show that Graves had formed an opinion or impression of the guilt or innocence of defendant. Graves' initial statement that her knowing Monte Newman might be a reason that she would not be impartial came in response to a specific question by the court, and further questioning demonstrated that Graves could be impartial and render a verdict based on the evidence. *Irvin*, 366 U.S. at 722-23, 6 L. Ed. 2d at 756, 81 S. Ct. at 1642-43.

Moreover, defendant does not show or even allege that there was any actual prejudice resulting from Graves' presence on the jury. We are not persuaded by defendant's argument that the circumstances here are more compelling than those in *Porter* to show partiality of the juror. The trial court in the instant case thoroughly questioned Graves, and allowed defense counsel's questions to Graves, regarding her ability to be impartial. We have reviewed the record, including the complete transcript of the *voir dire* proceedings, and find no manifest error or prejudice. *Irvin*, 366 U.S. at 723, 6 L. Ed. 2d at 756, 81 S. Ct. at 1643.

## II. Voluntary Intoxication Defense

Defendant next contends that his history of alcoholism and alcohol blackouts, use of prescription drugs, intoxication on the night of the murders and lack of memory of his actions when sober established that defendant was so intoxicated and drugged that he lacked the mental states required for the offenses for which he was convicted. Defendant does not specifically address, however, for which offense or offenses the mental states were not proven.

The State responds that the evidence showed that, at the time of the offenses, defendant's condition did not render him unable to form the requisite intent to commit the offenses. The State cites *People v. Madej* (1985), 106 Ill. 2d 201, and *United States ex rel. Simmons v. Gramley* (7th Cir. 1990), 915 F.2d 1128, 1135.

We note that when a defendant raises an affirmative defense other than insanity, "the State must sustain the burden of proving defendant guilty beyond a reasonable doubt as to that issue together with all the other elements of the offense." (Ill. Rev. Stat. 1985, ch. 38, par. 3—2(b).) Therefore, when the defendant sufficiently raises the defense of voluntary intoxication, the State has the burden of proof beyond a reasonable doubt as to the issue of defendant's mental state.

The statute in effect at the time of the subject offenses provided, in pertinent part:

"A person who is in an intoxicated or drugged condition is criminally responsible for conduct unless such condition ***:

(a) Negatives the existence of a mental state which is an element of the offense." (Ill. Rev. Stat. 1985, ch. 38, par. 6—3.)

Thus, the State was required to show beyond a reasonable doubt that the existence of the mental state for the offense was not negated by defendant's intoxication or drugged condition. *People v. Hurt* (1988), 175 Ill. App. 3d 970, 977; *People v. Bradney* (1988), 170 Ill. App. 3d 839, 855.

The information in the instant case charged defendant with acting either intentionally or knowingly with regard to the various offenses. Defendant was convicted of murder based on mental states of intent and knowledge (Ill. Rev. Stat. 1985, ch. 38, pars. 9—1(a)(1), (a)(2)). Further, the offense of attempt involves the mental state of intent. (Ill. Rev. Stat. 1985, ch. 38, par. 8—4(a).) Home

invasion involves both mental states of intent and knowledge, and defendant's conviction on one of the murder counts was based on the conviction for home invasion. Ill. Rev. Stat. 1985, ch. 38, pars. 12—11(a)(2), 9—1(a)(3).

The appellate court, in *People v. Olson* (1981), 96 Ill. App. 3d 193, 197, stated regarding an intoxication defense:

"A jury is not required to accept the conclusions of a psychiatrist with respect to this issue. [Citation.] Rather, the weight to be given any testimony relating to the mental state of the defendant is peculiarly within the province of the jury [citation], and where the evidence admits of two inferences, a reviewing court will not substitute its judgment unless the jury's decision is inherently impossible or unreasonable."

See also *Bradney*, 170 Ill. App. 3d at 855.

Defendant asserts that his history of alcoholism began with his father's alcoholism and that he and his father often got drunk together. When defendant went for alcohol treatment in 1984, he indicated on the intake form that he had "been told things that I done but didn't remember" and told the counselor that he had alcoholic blackouts or memory losses after drinking. Defendant's alcoholism was aggravated by the large number of prescription drugs he took. The expert witnesses at trial stated that the drugs tended to enhance the effects of one another and that alcohol would further enhance the effects of the drugs.

Defendant testified that on the night of the killings, he did not remember what happened after drinking his fifth beer. Defendant testified that he was intoxicated that night. Further, his parents, Dorothy and William Sr., testified that he was drunk when he stated that he had committed the murders. Dorothy and William Sr. described defendant as looking wild, crazy, drunk, and with bloodshot eyes. Two witnesses who saw defendant when

he purchased gas that night testified that he was "staggering" from drinking. The arresting police officer smelled alcohol on defendant's breath and stated that defendant was intoxicated. Garnett, the mental health worker who saw defendant on September 5, 1987, found defendant to be confused and not totally aware of what was going on. Defendant seemed to be in a daze, and did not talk about what had happened. Although defendant related his age and where he worked, he rambled and talked of anger toward his wives, and said nothing about the murders. Defendant stated that he learned of the murders in court.

The State notes that defendant shot and killed his wife Mary in Gallatin County and then drove to Saline County, reloaded the gun, and shot and killed Susan Newman and wounded Monte Newman. The State also points to defendant's going to his parents' home and then going to buy gasoline. Further, defendant was able to provide police with his name, date of birth, and other pertinent information.

The evidence in this case arguably supports two contrary inferences. Defendant presented a defense of voluntary intoxication and alcoholic blackout. His expert testified that it was "entirely possible" that defendant could have committed the offenses during an alcoholic blackout. The State's expert, on the other hand, did not believe that defendant was suffering from an alcoholic blackout or amnesic experience at the time of the offenses.

Our review of the record indicates that there was sufficient evidence for the jury to convict defendant of the offenses for which he was convicted. (*People v. Eyler* (1989), 133 Ill. 2d 173, 191.) The jury was presented with the testimony of defendant himself and numerous other witnesses who observed and spoke with defendant on the night of the offenses and the next day. Although

there was conflicting evidence as to defendant's lucidity and state of mind on the night of the offenses, the jury was in a superior position to observe the demeanor of the witnesses and judge their credibility. It was within the province of the jury to believe the witnesses for the State that defendant's intoxication or drugged condition did not negate the requisite mental states, but that defendant was capable of acting knowingly or intentionally at the time of the offenses. (*Olson*, 96 Ill. App. 3d at 197.) We cannot say that based upon the evidence, no rational trier of fact could have found defendant guilty beyond a reasonable doubt of the charged offenses. See *People v. Collins* (1985), 106 Ill. 2d 237, 261.

### III. Alleged Errors in the State's Opening Statement

Defendant next contends that statements by the prosecutor during opening statement to the jury improperly suggested that the trial was a mere formality. Specifically, defendant points to the following statement:

> "Now, as you heard the charges read, no doubt they are serious, but *the process that you as jurors go through is the same as if a man were spitting on a sidewalk.* You still have the same process, that is, to take the evidence as presented by the witnesses, take the law as the judge instructs you, go back into the juryroom and deliberate and determine whether or not this defendant is guilty or not.
>
>          \* \* \*
>
> In our society, we have rules and we have regulations and we have trials and we have rights. Today, we are exercising our rights. We are taking a situation which happened in September, 1987 and presenting it in a methodical way. Presenting witnesses. We have rules of evidence. *We don't take people out any more and throw the rope over a tree.* We have you twelve people who come here and decide what happened on September 4, 1987." (Emphasis added by defendant.)

Defendant asserts that these statements improperly and unfairly trivialized the case and diminished the presumption of innocence, in violation of defendant's due process rights under the Federal and Illinois Constitutions (U.S. Const., amend. V; Ill. Const. 1970, art. I, §2).

We note that defendant failed to object at trial to the prosecutor's statements and also failed to raise the alleged error in his post-trial motion. However, we consider the alleged error under the plain error doctrine (134 Ill. 2d R. 615(a)). Supreme Court Rule 615(a) allows a reviewing court in a criminal case to review an error which has not been properly preserved for review where the evidence is closely balanced or the error is so fundamental and of such magnitude that the defendant was denied a fair trial. (See *People v. Herrett* (1990), 137 Ill. 2d 195.) We do not find that the evidence of defendant's guilt is closely balanced here. However, we examine the issue raised to determine if error occurred and, if so, whether the alleged error constituted plain error.

With regard to the first portion of the statements, defendant asserts that a capital case should not be equated with spitting on a sidewalk. Defendant argues that the statement does not take into account that an affirmative defense would be presented and must be considered by the jury. With regard to the second portion of the statements, defendant asserts that the prosecutor improperly disparaged the rights of the defendant as nothing but formalities before the inevitable conviction and "hanging," which statement undercut the presumption of defendant's innocence. Defendant cites *People v. Johnson* (1986), 149 Ill. App. 3d 465, *People v. Harbold* (1984), 124 Ill. App. 3d 363, and *People v. Starks* (1983), 116 Ill. App. 3d 384.

The State proposes that, with reference to the first portion of the statements, the prosecutor was attempt-

ing simply to ease the nerves of the jurors. Regarding the second portion of the statements, the State suggests, the prosecutor was reminding the jurors of the offensive consequences which might follow absent a system of justice founded upon respect for individual liberties. Further, the State contends that even if error, the statements did not repeat a theme by the prosecution and did not violate due process.

We note that the purpose of an opening statement is to apprise the jury of what each party expects the evidence to prove. (*People v. Roberts* (1981), 100 Ill. App. 3d 469, 476.) An opening statement may involve a discussion of the evidence and reasonable inferences from the evidence. (*People v. Smith* (1990), 141 Ill. 2d 40, 63.) Remarks or argument by counsel which extend beyond the proper scope of opening statement constitute reversible error only where the remarks are attributable to deliberate misconduct of the prosecutor and result in substantial prejudice to the defendant. *Smith*, 141 Ill. 2d at 64.

In the instant case, we do not find prosecutorial misconduct or that the prosecutor's statements resulted in substantial prejudice to defendant in view of the totality of the evidence. With regard to the first portion of the statements, although it might have been preferable for the prosecutor, in discussing the jury's function in this capital case, to describe the jury's role in terms of other capital cases, or other murder cases, rather than a minor case of a person spitting, nevertheless, the statements, taken in their context, do not amount to prejudicial error. The context of the remarks indicates that the prosecutor was describing the legal process generally. The prosecutor then properly told the jury that it would be instructed by the court as to the law to be applied to the case. We cannot say that the jury was severely misled. Further, as noted above, the purpose of an opening

statement is to give a brief summary of the evidence each party expects to show in the case, and the prosecutor is not required to set forth what he expects the defendant to prove. See *People v. Roberts* (1981), 100 Ill. App. 3d 469, 476.

With regard to the second portion of the statements, we also do not find that the comments resulted in substantial prejudice to defendant. *Johnson, Harbold,* and *Starks,* cited by defendant, are factually distinguishable from the instant case and do not govern the result here. Arguably, a reasonable inference from the comments here, regarding throwing a rope over a tree, is that the prosecutor was attempting to belittle the presumption of innocence. To the extent that the comments attempted to disparage the presumption of innocence, they were improper. (See *People v. Dukes* (1957), 12 Ill. 2d 334, 342-43; *People v. Weller* (1970), 123 Ill. App. 2d 421, 428.) However, we do not find that the prosecutor deliberately misled the jury, and the statements, taken in the context of the entire opening statement and the trial as a whole, did not result in substantial prejudice to defendant. Therefore, we find no plain error.

### IV. Improper Testimony, Emphasized in Closing Argument

Defendant next asserts that testimony by State Trooper Ron Towery that defendant "didn't want to talk" after being informed of his *Miranda* rights, and the prosecutor's closing argument which emphasized that testimony, violated defendant's fifth amendment right against self-incrimination and right to due process of law, in addition to his sixth amendment right to effective assistance of counsel. U.S. Const., amends. V, VI.

Defendant notes that during cross-examination by defense counsel, Towery was asked how much time he had

spent in defendant's presence on the night of the incident:

> "Q. [Defense counsel]: And how much time did you spend in his presence at that point?
>
> A. [Trooper Towery]: After he was placed in the room, I went in the room and asked if he had been given his rights under the miranda [*sic*] which he had and been told that he didn't want to talk."

Defendant also points out that during closing argument, the prosecutor then argued that defendant was not intoxicated because he was able to answer questions from police after his arrest. Defendant cites the following portion of the prosecutor's argument:

> "The officer, Steven Huggins, testified later that same evening that he got what is known as a personal history from the defendant in which he asked him certain questions about his life, his family, occupation, age, and in his opinion, the defendant was not intoxicated. Trooper Towery testified that he obtained clothing from the defendant and he had no difficulty whatsoever removing that clothing from himself. Now if you've ever been really intoxicated, one of the toughest things in the world you've got to do is get your clothes off especially. *He had no difficulty in understanding any of the questions propounded by Officers Huggins and Towery.*" (Emphasis added by defendant.)

Defendant contends that this argument reminded the jury that defendant "didn't want to talk" after the *Miranda* warnings. Further, defendant asserts that the unsolicited testimony of Towery that defendant did not want to talk improperly suggested that defendant was concealing his guilt rather than suffering from an alcoholic blackout. Defendant relies on *Wainwright v. Greenfield* (1986), 474 U.S. 284, 88 L. Ed. 2d 623, 106 S. Ct. 634, to support his assertion that defendant's silence was ambiguous and was improperly used to rebut his intoxication defense, and breached the due process guaran-

tee that silence following *Miranda* warnings cannot be used against a defendant.

Defendant asserts that although defense counsel did not move to strike the unresponsive testimony or object to the closing argument at trial, nevertheless, the due process violation constituted plain error reviewable by this court. (*People v. Szabo* (1983), 94 Ill. 2d 327.) Defendant also contends generally, without explication, that defense counsel's omissions regarding the damaging testimony and argument was ineffective assistance of counsel in violation of defendant's sixth amendment right (*Doyle v. Ohio* (1976), 426 U.S. 610, 49 L. Ed. 2d 91, 96 S. Ct. 2240; *People v. Rothe* (1934), 358 Ill. 52).

We review defendant's due process claim under the plain error doctrine (134 Ill. 2d R. 615(a)), first determining if error occurred, and if so, whether the error amount to plain error (*People v. Herrett* (1990), 137 Ill. 2d 195).

The State asserts that the prosecutor cannot be held accountable for Towery's unresponsive answer, citing *People v. Yonder* (1969), 44 Ill. 2d 376, *overruled on other grounds, Wilson v. Clark* (1981), 84 Ill. 2d 186. The State asserts that the prosecutor did not attempt to make use of the defendant's exercise of his fifth amendment rights to obtain his conviction, and the prosecutor's argument was within the proper bounds set forth in *Greenfield*, 474 U.S. at 292, 88 L. Ed. 2d at 630-31, 106 S. Ct. at 639. The State asserts that the comments referred merely to defendant's answers given to routine booking questions asked by the police, which questions fall outside the protection of *Miranda*. *Pennsylvania v. Muniz* (1990), 496 U.S. 582, 110 L. Ed. 2d 528, 110 S. Ct. 2638.

Further, the State asserts that although curative instructions to the jury would be deemed to have eliminated any prejudice (*Greer v. Miller* (1987), 483 U.S.

756, 766 n.8, 97 L. Ed. 2d 618, 630 n.8, 107 S. Ct. 3102, 3109 n.8), nevertheless, there is no sixth amendment violation under *Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052, because defense counsel could reasonably have decided that an objection would only have served to call attention to an otherwise relatively innocuous remark.

We believe that Towery's response did exceed the bounds of a proper response to the State's question and should have been stricken. (See *People v. Burris* (1971), 49 Ill. 2d 98; *People v. Phillips* (1989), 186 Ill. App. 3d 668, 681.) However, we do not believe that Towery's statement alone, taken in the context of the full trial, in view of all of the evidence against defendant, amounted to harmful error.

Further, we do not find that the prosecutor's closing argument placed undue emphasis on Towery's improper remark. We agree with the State that the statements in closing argument appeared to be directed toward defendant's responses to routine booking questions following his arrest, rather than an improper comment on defendant's exercise of his fifth amendment right. We find no reversible error.

Moreover, we agree with the State that there was no sixth amendment violation. The United States Supreme Court in *Strickland* provided that ineffective assistance of counsel is shown where: (1) counsel made errors so serious and his performance was so deficient that defendant was denied reasonably effective assistance; and (2) the deficiencies so prejudiced defendant as to deprive him of a fair trial which reaches a reliable result. *Strickland*, 466 U.S. at 687, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064; see also *People v. Johnson* (1989), 128 Ill. 2d 253.

Here, we find that neither prong of *Strickland* is met. First, counsel's action was not so deficient that defendant was denied effective assistance, because coun-

sel reasonably could have decided not to object to the remark and argue its impropriety in order not to call further attention to the remark. .(*Strickland,* 466 U.S. at 691, 80 L. Ed. 2d at 696, 104 S. Ct. at 2066-67.) Further, we find that admission of the testimony and the statement in closing argument, in view of all of the evidence, did not result in substantial prejudice to defendant as to deny him a fair trial. *Strickland,* 466 U.S. at 687, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064.

### V. Improper Closing Argument

Defendant additionally contends that the prosecutor's closing argument denied him a fair trial in that the argument improperly attempted to shift the burden of proof, sought to frighten the jurors, and urged retribution.

The State responds that defendant waived his claim as to each of the three comments by the prosecutor because he failed to raise the claims in his post-trial motion. (*People v. Enoch* (1988), 122 Ill. 2d 176.) We review this issue also under the plain error doctrine (134 Ill. 2d R. 615(a); *People v. Herrett* (1990), 137 Ill. 2d 195).

Defendant points to the following portions of the closing argument:

"MR. HAUPTMANN [State's Attorney]: *** The only witness who says or claims that there was a blackout is this man right here. And why would he tell you that, what motive would he have to tell you that he was blacking out. *If he could convince you 12 people that that fact existed, he walks out the door.*

MS. ROCHFORD [Defense Counsel]: Your Honor, I object, it is not up to the defendant to prove the blackout.

COURT: Objection overruled.

MR. HAUPTMANN: *** He came to you 12 people and said I don't remember what happened. Life is too fragile to be held by such a thin string as what Mr. Leger says held it—I don't remember. *People will say, well I*

398

*want to kill somebody, I will start taking medication and drink a few beers and claim I don't know.* Ladies and Gentlemen, what I am suggesting to you but the Court will instruct you, that these acts that William Leger did were not mechanical acts, they were acts done for a purpose and that is to kill. You will have a chance to see the gun and photographs and *I want you to give Susan Newman the chance that William Leger never gave her. All I can remember is Monte Newman saying, she didn't have a chance, you 12 people can give her that chance.* Thank you." (Emphasis added by defendant.)

Defendant notes that it is reversible error for the prosecution to shift the burden of proof to the defense. (*People v. Weinstein* (1966), 35 Ill. 2d 467; *People v. Tyson* (1985), 137 Ill. App. 3d 912.) Defendant asserts that the argument was improper because the defense did not have the burden of proving the blackout. He asserts that the State had the burden of overcoming the intoxication defense. He argues that the trial court's overruling the objection left the jury with the impression that the defense had the burden to prove that defendant had an alcoholic blackout. Further, defendant notes that the prosecutor's comment that he could "walk" was improper because, even if he were not convicted in the instant case, held in Saline County, he still was facing charges for Mary's murder in Gallatin County.

In addition, defendant asserts that the prosecutor improperly appealed to the fears of the jury when he argued that if defendant's defense were successful, other people would be killed by persons claiming intoxication. Defendant cites *People v. Tiller* (1982), 94 Ill. 2d 303, and *People v. Witted* (1979), 79 Ill. App. 3d 156. Defendant asserts that his medical problems were unique, and his acquittal would not have resulted in other killings.

Finally, defendant asserts that the closing argument improperly called for retribution and revenge. Defendant notes that the tragic death of Susan Newman could not

be changed by the jurors, and it was not the function of the jurors to attempt to give Susan Newman the "chance" that the prosecutor suggested. Defendant cites *People v. Thomas* (1986), 146 Ill. App. 3d 1087, and *People v. Vasquez* (1972), 8 Ill. App. 3d 679.

The State responds that first, with regard to defendant's argument of shifting the burden of proof, unlike in *Weinstein* and *Tyson*, cited by defendant, the comment here did not affirmatively state that defendant must prove anything. The State asserts that the context of the prosecutor's comment indicates that counsel was discussing defendant's motives for testifying falsely and nothing more, and cites *People v. Phillips* (1989), 127 Ill. 2d 499.

The State also asserts that although the prosecutor's argument that defendant would "walk" was "not entirely accurate," nevertheless, the strength of defendant's motive to exculpate himself was not materially misrepresented because defendant faced a potential death sentence if convicted. Further, the State asserts that any error by the prosecutor in appealing to the fears of the jury was not sufficiently substantial to overcome defendant's waiver of the issue. The State cites *People v. Harris* (1989), 129 Ill. 2d 123, *People v. Stiff* (1989), 185 Ill. App. 3d 751, and *People v. Smith* (1990), 199 Ill. App. 3d 839.

An improper comment during closing argument may constitute reversible error where it is shown that had the comment not been made, the verdict would have been different. (*People v. Stewart* (1984), 104 Ill. 2d 463, 492.) The law further provides that it is reversible error for the prosecution to attempt to shift the burden of proof to the defense. (*Tyson*, 137 Ill. App. 3d 912.) However, we note, as argued by the State, that the cases on which defendant relies for his argument of reversible error are distinguishable from the instant case. In

*Weinstein*, this court found reversible error where the State on five or six occasions, without objection by the defense, repeated in argument to the jury that defendant had a burden to present evidence creating a reasonable doubt of her guilt, and commented that defendant's evidence did not create such doubt. *Weinstein*, 35 Ill. 2d at 433-35.

In *Tyson*, the appellate court found reversible error when the prosecutor improperly argued during closing argument that defendant was required, but had failed, to present a theory of innocence. The court held that the comment amounted to an improper argument that defendant had a burden to present evidence of his innocence. The comment was particularly harmful because defendant did not testify and the defense did not present any evidence. Further, because the trial court failed to admonish the jury to disregard the comment, the harmful effect was not cured. *Tyson*, 137 Ill. App. 3d at 920-22.

In the instant case, unlike in *Tyson*, defendant testified at trial and presented the affirmative defense of voluntary intoxication. Unlike in *Tyson* and *Weinstein*, the prosecutor here did not argue that defendant had a burden of proving his innocence or creating a reasonable doubt of his guilt. Rather, the comment regarding the blackout related to defendant's affirmative defense. Further, by contrast to *Weinstein*, the defendant here points to only one comment by the prosecutor, which was objected to by defense counsel, rather than the five or six to which no objection was made in *Weinstein*, 35 Ill. 2d at 433-35.

Although we believe that the trial court improperly overruled the objection, because the comment was an incomplete and potentially misleading description of the law regarding an affirmative defense, nevertheless, we do not find that the comment constituted reversible er-

ror. In view of the extensive evidence in this case regarding defendant's guilt and the evidence on the issue of defendant's intoxication, we do not believe that the verdict would have been different had the comment not been made. See *Stewart*, 104 Ill. 2d at 492.

## VI. Attempted Murder Instructions

Defendant next contends that jury instructions erroneously stated the elements of attempted murder as requiring intent to commit murder rather than intent to kill. Defendant further states that although this court has held that this alleged error can be waived (*People v. Adkisson* (1980), 83 Ill. 2d 1), and trial counsel failed to object to the instructions and failed to raise the error in the post-trial motion, nevertheless, the failure of counsel to submit alternative instructions resulted in ineffective assistance of counsel. (*Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052.) The State responds that any error in the instructions was harmless. Further, the State asserts that defendant cannot establish, pursuant to *Strickland*, that, but for counsel's failure to submit alternative instructions, defendant would have been acquitted of attempted murder.

This court in *People v. Roberts* (1979), 75 Ill. 2d 1, stated that where objections are not made to jury instructions, waiver is the rule. A limited exception is set forth in Supreme Court Rule 451(c) (134 Ill. 2d R. 451(c)), which provides for judicial review of "substantial defects" in jury instructions to which objection is not made where "the interests of justice require" such review. The exception is to be used to correct "grave errors," or where a case is close factually and fundamental fairness requires that the jury be properly instructed. *Roberts*, 75 Ill. 2d at 14.

The jury instructions for attempted first degree murder in this case read:

"A person commits the offense of attempt when he, with intent to commit the offense of first degree murder, does any act which constitutes a substantial step toward the commission of the offense of first degree murder.

The offense attempted need not have been committed.

To sustain the charge of attempt, the State must prove the following propositions:

First: That the defendant performed an act which constituted a substantial step toward the commission of the offense of First Degree Murder; and

Second: That the defendant did so with intent to commit the offense of First Degree Murder; and

Third: That at the time of the offense, the defendant was capable of acting intentionally.

If you find from your consideration of all the evidence that each one of these propositions has been proved beyond a reasonable doubt, you should find the defendant guilty.

If you find from your consideration of all the evidence that any one of these propositions has not been proved beyond a reasonable doubt, you should find the defendant not guilty.

* * *

A person commits the offense of first degree murder when he kills an individual without lawful justification if, in performing the acts which cause the death,

he intends to kill that individual or another; or

he knows that such acts will cause death to that individual or another; or

he knows that such acts create a strong probability of death to that individual or another; or

he is committing the offense of Home Invasion."

Defendant asserts that the instructions misstate the elements of attempted murder, as set forth in *People v. Trinkle* (1977), 68 Ill. 2d 198, and *People v. Harris* (1978), 72 Ill. 2d 16, and require that defendant's attempted murder conviction be reversed and the cause remanded for a new trial.

The State notes that some decisions have been reluctant to apply *Trinkle,* where, as here, the defendant was on trial for murder as well as attempted murder, and modification of the definitional murder instruction would have been inappropriate regarding the murder charge. The State cites *People v. Henderson* (1988), 175 Ill. App. 3d 483, *People v. Bailey* (1986), 141 Ill. App. 3d 1090, and *People v. Beverly* (1978), 63 Ill. App. 3d 186. The State also points out that the jury consistently found that defendant's conduct was intentional and specifically found that defendant intended to kill Susan Newman, and it was uncontested that defendant shot Monte Newman three times and threatened him before shooting him. The State also cites *People v. Moore* (1983), 95 Ill. 2d 404.

In reply, defendant asserts that whether the specific intent to kill Monte Newman was proven beyond a reasonable doubt was a factual question for the jury. Defendant asserts that the jury could have found that the intent was to kill Susan Newman but not Monte Newman.

In the instant case, we do not find grave error or that fundamental fairness requires that the jury have been instructed differently on the attempt murder charge. We briefly review case law in this area to demonstrate that defendant was not denied his right to a fair trial. See *Roberts,* 75 Ill. 2d at 14.

In *People v. Trinkle* (1977), 68 Ill. 2d 198, this court affirmed the appellate court's holding that an indictment and jury instructions regarding an attempted murder charge were "fatally erroneous" where their terms would allow the jury to have found the defendant guilty of the offense without finding a specific intent to kill. (*Trinkle,* 68 Ill. 2d at 199, 204.) The court noted that the jury instructions for attempted murder improperly included an instruction that the offense could be found

where an act was performed with the *knowledge* that such "creat[ed] a strong possibility of death *or great bodily harm*," as opposed to *intent* to *kill*. (Emphasis added.) (*Trinkle*, 68 Ill. 2d at 200-01; see also Ill. Rev. Stat. 1985, ch. 38, pars. 4—4, 4—5.) Further, in *People v. Harris* (1978), 72 Ill. 2d 16, this court reiterated that "[a]n instruction must make it clear that to convict for attempted murder nothing less than a criminal intent to kill must be shown." (*Harris*, 72 Ill. 2d at 27.) The court in *Trinkle* also noted, without specific reference to the facts before it, that felony murder, unlike attempted murder, also does not require an intent to kill. *Trinkle*, 68 Ill. 2d at 202. See also *People v. Viser* (1975), 62 Ill. 2d 568.

In the instant case, the jury instructions for attempted murder were erroneous in that they would allow the jury to convict for attempted murder based upon felony murder, *i.e.*, performance of the acts which cause death during the commission of home invasion. (See *Trinkle*, 68 Ill. 2d at 202; *Viser*, 62 Ill. 2d 568.) Further, one instruction erroneously allowed the jury to convict for attempted murder based on *knowledge* that the act performed would cause death or created a strong probability of death, rather than based on *intent* to kill. *Trinkle*, 68 Ill. 2d at 200-01.

However, we agree with the State that substantial evidence was presented to show that defendant acted with intent to kill Monte Newman. Newman testified that defendant shot him three times, once in the head, at relatively close range, after waking Newman and Susan Leger from sleep. In view of all of the evidence, even if there was error in the jury instructions, the error did not constitute "grave" or reversible error. (See *People v. Jones* (1979), 81 Ill. 2d 1.) Further, because we find that any deficiencies by counsel in failing to submit alternative instructions did not so prejudice defendant as to

deny him a fair trial, we find that defendant was not denied effective assistance of counsel. *Strickland v. Washington* (1984), 466 U.S. 668, 687, 80 L. Ed. 2d 674, 693, 104 S. Ct. 2052, 2064.

## VII. Waiver of Jury Sentencing

Defendant also contends that his waiver of a jury for sentencing was not knowing and intelligent because the trial court incorrectly advised him that the jury's decision between a death sentence and a prison sentence must be unanimous. Defendant asserts that the incorrect admonishments misled him as to the consequences of waiving a sentencing jury and denied him due process of law. Defendant cites *Johnson v. Zerbst* (1938), 304 U.S. 458, 82 L. Ed. 1461, 58 S. Ct. 1019.

The State initially responds that defendant has waived the issue because defense counsel at the post-sentencing hearing stated that it was not alleging that there was any error *by the court* in giving the admonishments to defendant, but rather that defense counsel was ineffective in advising defendant regarding the jury waiver issue.

We agree with the State that defendant failed properly to preserve this issue for review. The record shows that at the post-sentencing hearing, defense counsel did indicate that it was *not* asserting that the court's admonishments to defendant were insufficient. Further, as set forth below, we find that the alleged error does not amount to plain error. 134 Ill. 2d R. 615(a). See *People v. Herrett* (1990), 137 Ill. 2d 195.

The parties point to several portions of the record where the court asked defendant and defense counsel regarding the jury waiver, including the following:

"[Trial court]: The burden of proof is on the State to prove beyond a reasonable doubt that one or more of these aggravating factors did occur. *If a jury hears this*

*evidence then the jury must decide unanimously that one or more of these factors occurred. If they do not, then the death penalty does not apply and the Court could sentence you to a term other than the death penalty.* [Emphasis added by the State.] And there is a possibility in this case that you could receive a sentence up to life imprisonment under the statute. Now, *if a jury were to decide unanimously that the death penalty does apply* by virtue of one or more of the aggravating factors being present under subsection b, then the second part of the hearing is conducted to determine *if the Court shall impose a sentence of death.* [Emphasis added by the State.] Again, the jury must decide that unanimously.

Do you understand what I have told you so far?

DEFENDANT: Yes, Sir.

COURT: All right. Now, if you waive the right to a jury, all of these decisions are made by the Court. The Judge, myself, will determine whether or not one or more of the aggravating factors sufficient to impose the death penalty or to allow the death penalty to be imposed, is present. And in the second part of the hearing, the Court would determine *if the death penalty shall be imposed.* [Emphasis added by the State.] So, in other words, you have *twelve people who have to unanimously decide* that, there is only one—that person being myself, who would decide. [Emphasis added by defendant.] Do you understand that?

DEFENDANT: Yes, Sir."

Defendant asserts that defense counsel other than trial counsel, at the hearing on a post-sentencing motion by defendant, alleged that trial counsel failed to advise defendant prior to the jury waiver that a single juror's vote would require a prison sentence. Further, defendant asserts that the trial court's statements that the jury must be unanimous were correct as to voting for the death penalty but incorrect as to voting against the death penalty.

Defendant also requests that this court reconsider *People v. Morgan* (1986), 112 Ill. 2d 111, 139-42, in

which this court held that the defendant knowingly and intelligently waived his right to a jury for sentencing even where the trial court gave him an admonishment that all 12 jurors would have to come to a unanimous verdict as to "whether or not" defendant should be given the death penalty. (*Morgan*, 112 Ill. 2d at 141.) The court in *Morgan* noted that defendant had had ample time to consult with counsel, and the record showed that defendant relied on counsel's advice, rather than the court's admonishments, in deciding to waive the jury right. In addition, counsel did not object to the court's statements, and the court found that a commonsense understanding of the admonition was that there must be a unanimous decision by the jury "whether to" impose the death penalty. *Morgan*, 112 Ill. 2d at 141.

We decline defendant's request to reconsider the basis of *Morgan*, and find that *Morgan* controls the issue here. The record indicates that the court gave a very detailed and thorough explanation to defendant of the law regarding sentencing and defendant's right to a jury for sentencing and the consequences of a waiver of that right. Further, the record establishes that defendant discussed the issue with his attorney, and acknowledged that he understood he was waiving a jury and would have the trial court impose the sentence. The record convincingly shows that defendant knowingly and intelligently waived his right to jury sentencing. (See *People v. Madej* (1985), 106 Ill. 2d 201, 220-21.) Finally, we note that the trial court was not required, for a valid jury waiver by defendant, to expressly advise defendant that the favorable vote of a single juror will preclude imposition of the death sentence. (See *People v. Ruiz* (1989), 132 Ill. 2d 1, 20-21.) There was no plain error.

### VIII. Excessiveness of the Death Sentence

Defendant also contends that his death sentence is

excessive because the offense resulted from marital, emotional, and drinking problems, and defendant's background included excellent military and work records, serious medical problems, and no significant criminal history. Defendant relies on *People v. Carlson* (1980), 79 Ill. 2d 564, *People v. Buggs* (1986), 112 Ill. 2d 284, and *People v. Johnson* (1989), 128 Ill. 2d 253, in which this court vacated death sentences.

The State responds that defendant's long-standing abusive conduct toward women and those who interceded on their behalf, culminating in two murders and an attempted murder, justifies imposition of the death penalty.

In accord with constitutional and legislative pronouncements, this court has automatic authority to review any death penalty imposed. (Ill. Const. 1970, art. VI, §4(b); Ill. Rev. Stat. 1985, ch. 38, par. 9—1(i).) In determining whether a death sentence was properly imposed, this court is governed by the principle that "in capital cases the fundamental respect for humanity underlying the eighth amendment 'requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death.' " (*People v. Carlson* (1980), 79 Ill. 2d 564, 590, quoting *Woodson v. North Carolina* (1976), 428 U.S. 280, 304, 49 L. Ed. 2d 944, 961, 96 S. Ct. 2978, 2991.) The Illinois Constitution requires that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." (Ill. Const. 1970, art. I, §11. See also *People v. Tye* (1990), 141 Ill. 2d 1, 34 (Ryan, J., concurring in part and dissenting in part).) This court has vacated death sentences where such an extreme penalty was found to be inappropriate, in view of any relevant mitigating factors. *Tye*, 141 Ill.

2d at 35-36 (Ryan, J., concurring in part and dissenting in part) (citing *Johnson*, 128 Ill. 2d 253, *Buggs*, 112 Ill. 2d 284, and *Carlson*, 79 Ill. 2d 564); *People v. Gleckler* (1980), 82 Ill. 2d 145; *People v. Walcher* (1969), 42 Ill. 2d 159; *People v. Crews* (1969), 42 Ill. 2d 60.

Defendant compares his circumstances to those of the defendants in *Johnson*, *Buggs*, and *Carlson*. In all three of those cases, the court's decision to vacate the death sentence depended to a great extent on the presence of certain mitigating factors: no significant history of prior criminal activity (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(c)(1)) and action under extreme mental or emotional disturbance (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(c)(2)).

Specifically, in *Johnson*, defendant shot and murdered one man, shot and wounded two others, and took money from one of the victims. The incident occurred after defendant was fired from his job and returned to his place of employment to pick up his final paycheck. The defendant testified that he had been carrying a gun for protection while traveling on public transportation. On the day of the offenses, the defendant had used alcohol, cocaine, and marijuana laced with the drug "PCP."

When the defendant arrived at his former work place, he was told that there was no check for him, even though earlier he had been told that there would be a check. The defendant then shot the supervisor who had fired him, in addition to one of his former co-workers. The defendant forced another worker to check the safe in the office for money; however, the two were unable to gain access to the safe. The defendant then had the third victim lie on the floor, shot him twice, and took money from him. As the defendant was leaving, he saw that the third victim was still moving, and so he stabbed him.

The defendant in *Johnson* had only one prior criminal charge, for the misdemeanor offense of unlawful possession of a weapon, for which he completed supervision.

His work record was good, and he had expressed remorse for the crimes. In addition, the evidence showed that he suffered severe emotional distress from the loss of his job and then, after being told that there would be a paycheck for him, discovered that there was no check. The court, in vacating the death sentence, looked to *Carlson* and *Buggs*.

In *Buggs*, the defendant's wife and child died in a fire in their home. Defendant set the fire after arguing with his wife concerning her marital infidelities and being told by her that he was not the father of their two children. The defendant poured gasoline on his' wife and in the home before lighting a match.

The defendant had been drinking heavily during the month before the incident, and had a history of drinking problems, including blackouts. The defendant, however, had served in the military for 21 years, and had no prior history of serious criminal activity. A psychiatrist for the defense testified that the defendant suffered from an "Isolated Explosive Disorder" at the time of the offenses. There was also evidence, however, that the defendant previously had stabbed someone and had fired a shot between his son's legs during an argument with his wife six months before the subject offenses. In view of all of the circumstances surrounding the offenses and the character of the defendant, this court found that, absent the marital disharmony and dispute which triggered the tragic sequence of events, the offenses probably would not have occurred.

In *Carlson*, the defendant was convicted of the murder of his former wife and a police officer who attempted to arrest the defendant after his wife's murder. The defendant and his wife, after 19 years of marriage, divorced three months prior to the murders. The defendant became distressed when learning of his former wife's

boyfriend, and then shot and killed her and set fire to her home.

The defendant then went to a bar and attempted to call his daughter. He ordered drinks, and then gave some money to a friend to provide for his son's education. Three police officers arrived at the bar, intending to arrest the defendant. The defendant shot and killed one police officer, and shot and wounded another officer, before the third officer took the gun away from the defendant.

The defendant, however, had no prior criminal record and had suffered severe physical and emotional problems in the two years prior to committing the two murders. Expert testimony showed that the defendant was distraught over his divorce and his wife's new boyfriend. Further, the defendant had shown concern for his son.

The trial court in the instant case distinguished *Carlson* from the facts before it. In the instant case, the trial court noted, defendant's divorce from Susan had occurred in 1983, several years prior to the murder, whereas in *Carlson*, the defendant had gone through a divorce three months prior to the murder. Further, the trial court stated that the defendant in *Carlson* did not have a history of criminal activity, whereas Leger had a prior DUI conviction and two battery convictions.

We find, however, that there exist sufficient substantial similarities in this case compared with *Johnson*, *Buggs*, and *Carlson* to conclude that the death sentence in this case is excessive. The circumstances of this offense and the character of defendant do not demonstrate that the death sentence is appropriate, or that the deterrent and retributive purposes of the death penalty will be served by imposing the death penalty. See *Johnson*, 128 Ill. 2d 253.

Defendant presented substantially more evidence of his medical, marital, and emotional problems during

the sentencing hearing than was presented at the guilt phase of his trial. Defendant himself and other defense witnesses testified as to the very serious injury defendant sustained in 1970, at age 24, when a 10-ton shuttle car rolled over his legs while he was working in the mines, nearly requiring that his legs be amputated. After suffering the mining injury, defendant had continuous back and leg problems, leading to three back surgeries. Further, defendant was taking 10 different prescription drugs, including anti-anxiety medication and medication containing codeine and librium, over the course of six years. Both the defense and the prosecution's experts testified that the medications had an enhancing effect when taken together, and that their effect would further be enhanced if taken with alcohol. Both experts testified that the medications could affect a person's reasoning ability.

In addition, defendant had a long history of alcohol problems, beginning at home at age four. Defendant had attempted to stop drinking, attended self-help meetings, and remained sober for almost a year beginning in 1985. Defendant's work record was very good, and the evidence shows that during the course of defendant's continuing medical problems, he continued to return to work when he was able to do so. The trial court noted that defendant expressed remorse.

The two battery convictions in defendant's record apparently are connected to his marital problems with Susan. One offense occurred on February 2, 1983, and the other on May 4, 1983 (although the conviction for the second offense was entered in 1984, and this offense is referred to in testimony as the 1984 battery conviction). The record indicates that defendant and Susan separated on or about February 21, 1983, and that the judgment of dissolution of their marriage was entered on May 5, 1983, after 17 years of marriage.

Although the record shows that defendant had a history of abuse towards Susan, the May 4 offense occurred one day prior to the entry of their divorce judgment. Similarly, the offenses in the instant case occurred only five days prior to the date on which defendant's divorce from Mary was to be entered. The record indicates that defendant was not abusive towards his children, and that other than his marital discord, he otherwise was not violent.

The trial court, however, failed to consider defendant's impending divorce from Mary in mitigation, as part of the emotional disturbance from which, the evidence indicates, defendant was suffering. Rather, the trial court merely concluded generally that defendant was not suffering from extreme emotional distress. The trial court also distinguished *Carlson* on the basis that defendant Leger's divorce from *Susan* had occurred several years prior to the offense, unlike the circumstances in *Carlson*, where the defendant's divorce occurred within months of the offenses. The trial court did not state that it took into account defendant's pending divorce from Mary. We believe, however, that the evidence shows that defendant was suffering extreme emotional disturbance at the time of the offenses.

There are also a number of other circumstances in mitigation of the offenses. The record shows that a number of people in the community stated that they got along well with defendant, and that defendant did not display any violence. Defendant served as union president for the mine workers over several years. In addition, defendant enlisted in the Air Force and served for more than 3½ years, receiving an honorable discharge and four medals of commendation. In view of these circumstances, and the evidence that defendant's violent acts were triggered by his impending divorce

and his emotional disturbance over his history of marital problems, we believe that the death sentence is excessive.

Based upon the particular circumstances of this case and the trial court's findings at the sentencing hearing, however, we believe that a remand of this matter for resentencing is unnecessary. Section 5—8—1(a)(1) of the Unified Code of Corrections (Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—1(a)(1)) sets forth sentencing guidelines for murder. Specifically, subsection (b) of section 5—8—1(a)(1) (Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—1(a)(1)(b)) provides that a court may impose a term of natural life imprisonment on a defendant where the murder "was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty" or where the court finds that any of the aggravating factors listed in section 9—1(b) of the Criminal Code of 1961 (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(b)) are present.

At the sentencing hearing in the instant case, the trial court found that certain of the aggravating factors of section 9—1(b) of the Criminal Code of 1961 were present. For instance, defendant murdered Susan Leger with intent to kill and in the course of another felony, namely, home invasion. (See Ill. Rev. Stat. 1985, ch. 38, par. 9—1(b)(6).) Accordingly, under section 5—8—1(a)(1)(b) of the Unified Code of Corrections, defendant is subject to a sentence of natural life imprisonment. (Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—1(a)(1)(b).) Based on the unique circumstances surrounding this offense, and pursuant to our Rule 615(b)(4), we reduce the trial court's sentence in this case to a term of natural life imprisonment. 134 Ill. 2d R. 615(b)(4).

## IX. Ineffective Assistance of Counsel

Defendant next contends that he was denied effective assistance of counsel at sentencing when counsel failed to move to suppress a statement by jailer Zack Gibbons improperly obtained in violation of the fifth amendment and which was used in aggravation against defendant. The *Strickland* test provides that ineffective assistance of counsel is shown where: (1) counsel made errors so serious and his performance was so deficient that defendant was denied reasonably effective assistance; and (2) the deficiencies so prejudiced defendant as to deprive him of a fair trial which reaches a reliable result. (*Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052; see also *People v. Johnson* (1989), 128 Ill. 2d 253.) A court need not apply the first part of the *Strickland* test if the second part has not been met. *Johnson*, 128 Ill. 2d 253.

Defendant notes that in sentencing defendant, the trial court referred to Gibbons' statements that defendant had said that he wished Monte Newman had died also and then that he should not have said that. Defendant notes that in a post-sentencing motion, defense counsel asserted that the statements to the jailer had been obtained unconstitutionally and that trial counsel had been ineffective for not seeking to suppress the statements. The court granted an evidentiary hearing. The jailer, defendant, and defense trial counsel testified at the hearing. The two trial counsel testified that they had learned of Gibbons' potential testimony before the sentencing hearing but had not considered moving to suppress the testimony. Rather, they decided to counter the testimony with defendant's denial of the statements. The trial court denied the post-sentencing motion, finding that the statements

were not unconstitutionally obtained and that there was no sixth amendment violation.

The State responds that because defendant's statement was neither deliberately elicited nor made in response to custodial interrogation, defendant cannot establish that counsel's failure to suppress the statement was incompetent and would have resulted in the imposition of a noncapital sentence. The State asserts that the trial court properly found that admission of the statement did not violate *Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, or defendant's sixth amendment right to counsel. The State maintains that defendant bears the burden of showing "deliberate elicitation" and "custodial interrogation" (*Kuhlmann v. Wilson* (1986), 477 U.S. 436, 459, 91 L. Ed. 2d 364, 384-85, 106 S. Ct. 2616, 2629-30; *Berkemer v. McCarty* (1984), 468 U.S. 420, 441, 82 L. Ed. 2d 317, 335-36, 104 S. Ct. 3138, 3151), and that defendant has failed to show that Gibbons' engaging defendant in a conversation concerning marital problems was deliberately intended to produce evidence of defendant's guilt (*Kuhlmann*, 477 U.S. at 459, 91 L. Ed. 2d at 384-85, 106 S. Ct. at 2629-30). The State notes also that it did not mention the evidence in its closing remarks to the court.

We find no sixth amendment violation. In view of all of the evidence which the trial court considered at sentencing, we conclude that defense counsel's failure to move to suppress the statement did not result in prejudice to defendant such that he was deprived of a fair trial which reached a reliable result. Thus the second prong of *Strickland* is not met. *Strickland*, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052; see also *Johnson*, 128 Ill. 2d 253.

However, even assuming that the second prong is met, we find that defendant fails to show that the first

prong of the *Strickland* test is fulfilled. We agree with the State that defendant did not prove that the State deliberately attempted to elicit the statement from defendant regarding Monte Newman (see *Kuhlmann*, 477 U.S. 436, 91 L. Ed. 2d 364, 106 S. Ct. 2616; *Moulton*, 474 U.S. 159, 88 L. Ed. 2d 481, 106 S. Ct. 477), and so the record does not support a finding of a fifth amendment violation. Accordingly, we cannot conclude that but for defense counsel's failure to move to suppress the statement, the trial court would have imposed a lesser sentence. See *Strickland*, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052.

Because we vacate the death sentence, we need not address defendant's remaining contentions.

For the foregoing reasons, the judgment of the trial court regarding defendant's convictions is affirmed, the death sentence is vacated, and a term of natural life imprisonment is imposed.

> *Convictions affirmed;*
> *death sentence vacated;*
> *natural life imprisonment imposed.*

CHIEF JUSTICE MILLER, concurring in part and dissenting in part:

I join that part of the court's opinion affirming the defendant's convictions. I do not agree with the majority, however, that the defendant's death sentence must be vacated, and therefore I dissent from that portion of the court's judgment.

The majority concludes that the death penalty is excessive in the present case and reduces the defendant's sentence to a term of natural life imprisonment (see Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—1(a)(1)(b)). In support of this holding, the majority relies primarily on *People v. Johnson* (1989), 128 Ill. 2d 253, *People v. Buggs* (1986), 112 Ill. 2d 284, and *People v. Carlson*

(1980), 79 Ill. 2d 564, cases in which this court vacated death sentences as excessive. I dissented from that portion of the court's judgment vacating the sentence in *Buggs*, and I continue to believe that the death penalty was proper punishment in that case. But even if it is assumed that the facts of *Johnson, Buggs*, and *Carlson* provide a reliable baseline for determining the appropriateness of the death penalty in all circumstances, I do not believe that those cases compel the court's result here. In today's decision, the majority virtually ignores the aggravating evidence introduced in the proceedings below, including the defendant's long history of abusive behavior toward the murder victim, Susan Newman, and the defendant's killing of his second wife, Mary Leger.

As is so common in cases of this type, the history of violence committed by the defendant is much more extensive than the list of offenses disclosed by his formal criminal record. According to testimony presented at the sentencing hearing, the defendant had long abused both his former wives. Billie Sue Cullison, the older daughter of the defendant and Susan, testified that the defendant had repeatedly beaten Susan during the course of the couple's 17-year marriage. The defendant attempted to kill Susan in 1983, after the couple had separated but before their divorce was made final. On that occasion, the defendant entered the marital home one night and placed a gun to Susan's head. Billie Sue interceded and was able to persuade her father to leave the premises peacefully. Other evidence established that the defendant also had physically abused his second wife, Mary Leger. A Ridgway police officer testified that he had been summoned to the defendant's home six or seven times in response to complaints of domestic disputes and on each occasion noticed bruises on Mary.

In support of its decision, the majority emphasizes that the defendant was in the final stages of obtaining a divorce from Mary Leger when he committed the murder involved here. The majority fails to consider, however, that the defendant also killed Mary Leger on the same evening he murdered Susan Newman. According to the evidence, the defendant first shot and killed Mary in Ridgway, in Gallatin County. Later, the defendant drove to neighboring Saline County and entered the Eldorado home occupied by Susan Newman and her husband, Monte Newman. The defendant shot the Newmans, killing Susan and wounding Monte. The defendant was charged in the circuit court of Gallatin County with first degree murder for Mary's death; he was convicted of second degree murder in a partially stipulated bench trial conducted after the conclusion of the Saline County proceedings at issue here. See *People v. Leger* (1991), 208 Ill. App. 3d 333.

If, as the majority states, the defendant's offenses were the result of longstanding marital discord and physical problems, including his consumption of alcohol and of a wide variety of ethical drugs, then those circumstances may help explain the defendant's actions. They fail to excuse his crimes, however. Measured against an individual's history of violence and the seriousness of his offenses, evidence of that nature will at some point cease to be mitigating. I believe that point was reached in this case. The defendant's lengthy history of abusive behavior and his series of offenses on the day in question, including the killing of two persons and the attempted murder of a third, together distinguish the present matter from cases such as *Johnson*, *Buggs*, and *Carlson*, in which this court found the death sentence to be an excessive penalty.

Sentencing determinations are among the most difficult decisions a judge is called upon to make. In the

bench proceeding in this case, the trial judge carefully considered the circumstances of the offense and the parties' evidence in aggravation and mitigation. In this regard, the judge took note of the defendant's personal and physical problems. The trial judge expressly distinguished *Carlson*, correctly observing that in the present case the defendant's divorce preceded the murder by a much longer period of time. The judge thoroughly assessed the relevant considerations and concluded that the death penalty was the proper sanction for the defendant's conduct. On this record, I cannot agree with the majority that the sentence imposed by the trial judge is excessive.

JUSTICE HEIPLE, also concurring in part and dissenting in part:

I disagree with that portion of the majority opinion which vacates the defendant's death sentence. A review of the record demonstrates that the sentence was not excessive, that all relevant factors were considered, and that the trial court did not abuse its sentencing discretion.

The evidence presented reveals that on the evening of September 4, 1987, the defendant first shot and killed his estranged wife, Mary, in Gallatin County. Shortly thereafter, the defendant drove to neighboring Saline County and broke into the home of his former spouse, Susan Newman, while she and her husband, Monte Newman, were sleeping. The defendant then proceeded to shoot Susan three times and shot Monte three times. Susan died but Monte survived the brutal attack. The defendant then drove to his parents' house and when his mother noticed blood on the defendant's shirt he stated, "I killed those two whores and that man." Following his arrest, the defendant told a jail officer that he wished Monte had died also.

At the second stage of the death sentence hearings, the trial court heard the following evidence in aggravation. Billie Sue Cullison, the defendant's and Susan Newman's daughter, testified that the defendant had previously held a gun to her mother's head and threatened to kill her and that she had seen the defendant beat her mother on numerous occasions. The defendant's criminal record shows that he has two battery convictions stemming from his abusive treatment of Susan. Reverend Russell Helton stated that the defendant had threatened to kill him when he was counseling Susan during the divorce proceedings.

In mitigation, evidence was presented that the defendant had suffered a mining injury and that at the time of the incidents he was taking 10 different prescription drugs. In addition, the defendant had a long history of alcohol problems. Evidence was also presented that the defendant was suffering from emotional distress caused from his impending divorce from Mary. Several witnesses testified that the defendant did not display any violent tendencies. The defendant also served as union president for the mine workers over several years and he had been honorably discharged from the Air Force, receiving four medals of commendation.

In sentencing the defendant to death the trial judge stated: "It is the duty of the court to weigh the mitigating factors against the aggravating factors, which I have done, both statutorily and nonstatutorily, and I must conclude that there are no mitigating factors in this case sufficient to preclude the imposition of the death penalty." In so finding, the trial judge specifically found that: (1) the defendant "premeditatedly and cold-bloodedly over a period of five-years intended to wait until such time" as he could kill Susan; (2) the defendant was not acting under extreme mental or

emotional distress at the time he committed the offenses but that based on his conduct and statements his acts were deliberate; and (3) the defendant's claim of amnesia blackout were wholly unsupportable. Finally, the trial judge in handing down his sentence stated to the defendant:

"I am finding, Sir, that based on your prior conduct, I am concluding that over a period of years you have demonstrated that you cannot be rehabilitated. That you, Sir, are indeed a danger to society. I am sorry that you have undergone the physical problems that you have; nevertheless, these problems did not give you the right, nor the divorce problems, give you the right to take another human life—that of Susan Newman."

The majority decision finds that the sentence was excessive and that the trial court failed to consider the mitigating effect of defendant's emotional distress related to his impending divorce. In fact, the trial judge, while not specifically mentioning the marital problems that the defendant was having, stated that he had considered the defendant's "divorce problems" and that this did not excuse his actions. Further, the trial judge found that even if the defendant was suffering from extreme mental and emotional distress at the time the crimes were committed, this mitigating factor would not necessarily preclude the imposition of the death penalty given the overwhelming evidence in aggravation.

From the foregoing record it appears that the trial judge scrupulously complied with the guidelines laid down in the statute for imposing the death penalty. The death sentence was warranted under the facts of the case and the applicable law.

Accordingly, I respectfully dissent.