2023 IL App (2d) 220290-U
No. 2-22-0290
Order filed September 19, 2023

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of Kane County. |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 20-CF-387 |
| | ) | |
| LUIS ALBERTO NAJERA-AYALA, | ) | Honorable |
| | ) | Alice C. Tracy, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE MULLEN delivered the judgment of the court.
Justices Hutchinson and Jorgensen concurred in the judgment.

**ORDER**

¶ 1    *Held*: Defendant's convictions of predatory criminal sexual assault of a child and aggravated criminal sexual abuse are affirmed where the State's remarks during its opening statement, closing argument, and rebuttal closing argument did not constitute reversible error.

¶ 2    Following a jury trial in the circuit court of Kane County, defendant, Luis Alberto Najera-Ayala, was convicted of six counts of predatory criminal sexual assault of a child (720 ILCS 5/11-1.40(a)(1) (West 2020)) and one count of aggravated criminal sexual abuse (720 ILCS 5/11-1.60(c)(1)(i) (West 2020)). The trial court sentenced defendant to a term of seven years' imprisonment on each of the former convictions and a term of three years' imprisonment on the

latter conviction, with all sentences to run consecutively. On appeal, defendant argues that his convictions should be reversed and the case remanded for a new trial because the prosecution misstated the evidence during its opening statement, its closing argument, and its rebuttal closing argument. We affirm.

¶ 3                                 I. BACKGROUND

¶ 4                          A. The Charges Against Defendant

¶ 5    Defendant was charged by indictment with eight counts of predatory criminal sexual assault of a child (720 ILCS 5/11-1.40(a)(1) (West 2020)) (counts I through VIII), one count of indecent solicitation of a child (720 ILCS 5/11-6(a) (West 2020)) (count IX), and one count of aggravated criminal sexual abuse (720 ILCS 5/11-1.60(c)(1)(i) (West 2020)) (count X). The State dismissed count IX prior to jury deliberations.

¶ 6    The charges stemmed from conduct between defendant, a person 17 years of age or over, and defendant's partner's daughter, V.M., a minor under the age of 13 years. Counts I and II alleged that on or about February 1, 2020, through February 20, 2020, defendant committed acts of sexual penetration with V.M. in that he placed his penis in V.M.'s sex organ (count I) and his hand in V.M.'s sex organ (count II). Counts III, IV, V, VII, and VIII variously alleged that, during a period from June 23, 2013, through February 20, 2020, defendant committed acts of sexual penetration with V.M. in that he placed his penis in V.M.'s sex organ (count III), his penis in V.M.'s anus (counts IV and V), and his mouth on V.M.'s sex organ (count VII and VIII). Count VI alleged that, during a period from June 23, 2013, through February 20, 2020, defendant committed an act of contact, however slight, between his hand and V.M.'s sex organ for the purpose of the sexual arousal or gratification of V.M. or defendant. Count X alleged that defendant committed an act of sexual conduct with V.M. in that he placed his hand on her breast for the

purpose of the sexual gratification or arousal of V.M. or defendant. Counts III through VIII and count X provided that an extended statute of limitations applied because V.M. was under 18 years of age when the offenses were committed and she was under 38 years of age when the charges were filed. 720 ILCS 5/3-6(j) (West 2020).

¶ 7                                    B. Pretrial Proceedings

¶ 8     Prior to trial, the State filed a notice of intent to introduce statements made by V.M. to medical personnel pursuant to section 115-3 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-13 (West 2020)). The State also filed a notice of intent to introduce out-of-court statements made by V.M. to various individuals pursuant to section 115-10 of the Code (725 ILCS 5/115-10 (West 2020)). Following an evidentiary hearing, the trial court permitted the State to introduce the statements referenced in the notices.

¶ 9                                    C. Jury Trial

¶ 10     A jury trial commenced on May 9, 2022. During opening statements, the State told the jury about V.M. and her allegations against defendant. The State also told the jury that after V.M.'s disclosure:

> "[T]he Elgin Police Department *** went to [V.M.'s] home. They went into the room where the sexual assault occurred. And they collected [V.M.'s] clothing and they collected [V.M.'s] underwear. [V.M.'s] underwear was sent to the Illinois State Police Crime Lab. And inside the crotch area of 9-year-old [V.M.'s] underwear was the defendant's semen and DNA."

¶ 11     Following opening statements, the State presented evidence that in February 2020, V.M. was in fourth grade. On February 21, 2020, V.M.'s class attended an "Erin's Law" presentation in which she and her classmates were taught about childhood sexual awareness, what to do if they

are touched inappropriately, and the importance of reporting "unsafe touches" to a trusted adult. The presentation featured a video about a boy who was sexually abused by his uncle and reported the abuse to authorities. V.M. testified that she felt that the presentation exemplified "a situation that [she] was going through." After school that day, V.M. approached her mother, Roselli Sanchez, and told her about the presentation. V.M. also told her mother that defendant had touched her "private parts." Later that night, V.M. told her mother the same thing in defendant's presence. The next day, V.M. talked to the police.

¶ 12    V.M. testified that defendant touched her "private parts" in their house on Jay Street in Elgin. The incidents, which occurred more than one time, happened in the bathroom and bedroom. V.M. testified that the touching involved her "front part" and her mouth. V.M. clarified that her "front part" is what she uses "[t]o pee." V.M. described an incident in the bedroom in which defendant touched her "front part" with his hands and his "private part." V.M. also stated that defendant put his "private part" in her "front part." She testified that sometimes defendant would walk in on her when she was showering, and would touch her "private part" with his hands and insert his "private part" in her front "private part." She also testified that defendant occasionally touched her chest with his hands. The State asked V.M. to indicate on an anatomical diagram of a female where defendant had touched her. V.M. circled the breast and pelvic areas. The State also showed V.M. an anatomical diagram of a male and asked her to circle on the diagram the parts with which defendant touched her. V.M. circled the penis and a hand.

¶ 13    V.M. stated that after defendant finished, he would tell her to "[g]o to the bathroom" and "[c]lean up and do [her] necessaries, like go pee." V.M. testified that defendant told her not to tell anyone about what he did because it was their secret. He also told V.M. that he would go to jail if she told anyone and he did not want that. According to V.M., her mother was at work at the times

defendant touched her. V.M. testified that she did not tell her mother about defendant's conduct when it was happening because she was scared. When the incidents occurred, V.M. lived with defendant, her mother, her sister, and her brother. V.M. testified that, at the time of her testimony, her sister was nine years of age, and her brother was six years of age.

¶ 14    Roselli Sanchez testified that she has three children, including V.M., who was born on June 23, 2010. Defendant was Sanchez's former partner and is the biological father of V.M.'s younger brother. Sanchez testified that after coming home from school on February 21, 2020, V.M. told her that she had watched a video that she did not like. V.M. started crying and said that defendant had touched her. Sanchez asked V.M. how defendant had touched her. V.M. cried and did not respond. After comforting V.M., Sanchez went to her bedroom to get ready for work. V.M. followed Sanchez. V.M. reiterated that defendant had touched her in ways she did not like. At that time, V.M. did not describe how defendant had touched her. Sanchez went to work, but her sister-in-law, who lived in the same house, watched V.M. that night.

¶ 15    When Sanchez returned from work, she confronted defendant about what V.M. had told her. Defendant denied the allegations and insisted that V.M. make them to his face. Sanchez brought V.M. into the room. Defendant told V.M. to look Sanchez in the eyes and tell Sanchez how he was touching her. V.M. looked down and began to cry. Sanchez told V.M. to say where defendant had touched her. V.M. pointed to her vagina. Defendant denied touching V.M. in that area.

¶ 16    The next morning, after defendant left for work, Sanchez asked V.M. again to describe how defendant had touched her. V.M. cried and said that at night, defendant would tell her to take off her clothes. He would then get on top of her and "put his thing in her private part." V.M. also said that defendant would walk in on her when she was in the shower. V.M. told Sanchez that the

incidents began three years earlier, when the family lived in a different house. Sanchez asked V.M. why she had not previously related what was happening. V.M. responded that defendant told her that it was a secret. Sanchez called the police and took V.M. to the hospital. V.M. was later transferred to a second hospital.

¶ 17    Sanchez testified that on February 23, 2020, the police came to her house to collect evidence. An officer told Sanchez that he was looking for V.M.'s clothing. At the officer's request, Sanchez put on gloves and retrieved from a hamper clothes V.M. had recently worn, including a pair of underwear. Sanchez stated that the hamper contained dirty clothes belonging to her and her kids. Sanchez further testified that on February 23, 2020, she took V.M. to the Child Advocacy Center.

¶ 18    On cross-examination, Sanchez testified that in February 2020, she, defendant, V.M., and her two other children were living on Jay Street with her sister-in-law and her sister-in-law's three daughters. Sanchez testified that she, defendant, and her three children shared a bedroom. Sanchez's sister-in-law and her three daughters shared another bedroom. A family friend was also staying with Sanchez around that time, but she lived in the basement.

¶ 19    Adriana Isaia testified that she is a nurse at Sherman Hospital. On February 22, 2020, Isaia assisted with V.M.'s treatment in the hospital's emergency room. Isaia described V.M.'s demeanor as "crying," "hunched over," "very withdrawn," and "sad." Isaia took V.M.'s history, which was necessary to determine the appropriate examinations and treatment. V.M. recounted that when she was left alone with her "stepdad," he would show her his private parts and penetrate her with his penis or his fingers. V.M. reported that this happened in her bedroom, the bathroom, or the living room and that her "stepdad" would make her shower afterwards. V.M. also reported that she was told to keep the occurrences a secret. V.M. stated that the most recent incident happened two days

earlier, which was a Thursday. The staff at Sherman Hospital sent V.M. to Lutheran General Hospital for a specialized pediatric examination and treatment. On cross-examination, Isaia testified that V.M. was in the company of her mother during the entire time she was in the emergency room. Isaia also recalled that V.M. pointed to her breast and groin areas when asked if she had been touched anywhere.

¶ 20    Anne Marie Orescanin testified she is an emergency room physician at Lutheran General Hospital. Dr. Orescanin treated V.M. on February 22, 2020, after she had been transferred from Sherman Hospital. Dr. Orescanin took V.M.'s history to guide her physical examination and determine the appropriate treatment. V.M. told Dr. Orescanin that her "stepfather" had inappropriately touched her private parts. V.M. stated that he inserted his fingers and penis in her vagina. V.M. reported that the incidents occurred in multiple locations, including her parents' bedroom and in a bathroom. V.M. stated that the incidents had occurred since she was "little," with the most recent incident taking place on Thursday, which was "about two days beforehand." Dr. Orescanin examined V.M. and collected samples for a sexual assault kit. Dr. Orescanin testified that V.M. had a normal examination. On cross-examination, Dr. Orescanin testified that V.M. did not report anal penetration during the contact days earlier. Dr. Orescanin further stated that she did not find any scratches, bruises, or rashes on V.M.'s genitals or rectum area during the physical examination.

¶ 21    Alexandria Kichka testified that she is a nurse in the pediatric emergency department at Lutheran General Hospital. On February 22, 2020, Kichka assisted Dr. Orescanin in the examination and treatment of V.M. as well as the collection of the samples for V.M.'s sexual assault kit. According to Kichka, V.M. reported that the most recent incident had occurred a day or two prior to the hospital visit.

¶ 22 Kassandra Osorio is a forensic interviewer at the Child Advocacy Center. Osorio interviewed V.M. on February 23, 2020. At the time, V.M. was nine years of age. The interview, which was video recorded, was conducted in Spanish. Osorio testified that People's Exhibit No. 24 is an accurate transcription of the interview translated into English. The jury viewed the recording of the interview and was provided copies of the English transcript.

¶ 23 According to the English transcript of V.M.'s interview, Osorio asked V.M. a series of introductory questions. Osorio then said, "sometimes I talk with kids when something happened, has something happened to you?" V.M. responded in the affirmative. Osorio asked V.M. to tell her "about that." V.M. replied, "I think it was Thursday my dad [*sic*] was touching my private part." V.M. later explained that she was talking about her "step-dad," who she also identified by defendant's name. V.M. stated that defendant touched her almost every day and always when Sanchez was at work. Osorio asked clarifying questions, and V.M. described defendant touching her vagina, anus, and breast with his hands, inserting his penis in her vagina and anus, and giving her "kisses" on her vagina.

¶ 24 V.M. described the incident that occurred on Thursday, which was the most recent time defendant touched her. V.M. stated that her siblings went to sleep and she was about to when defendant "started to take [her] clothes off and he started touching [her] and *** [she] didn't like it." V.M. stated that, in the bedroom, defendant touched her vagina with his penis and his hand. When asked if defendant touched her "on top of [the] vagina, inside [the] vagina, or something different," V.M. responded "inside the vagina." V.M. stated that defendant told her that "its [*sic*] a secret," that "no one should know about this," and that "if someone knew then someone could maybe go to *** jail." Osorio asked V.M. to describe defendant's "part." V.M. said that it was "big" and "had hair" around it. When asked if it was "hard, soft, or something else," V.M.

responded that she did not know "if it was soft or that." Osorio asked V.M. if she "kn[e]w if something came out of [defendant's] part." V.M. responded in the negative. Osorio inquired how the Thursday occurrence stopped. V.M. stated that she related to her mom what happened the next day.

¶ 25    V.M. also described to Osorio an undated incident in the bathroom. V.M. stated that she was showering when defendant entered without permission, started touching her with his hand, and "put in his thing." V.M. stated that defendant touched her chest, vagina, and butt. Osorio again asked V.M. if defendant's "part" was "hard[,] soft or something different." V.M. responded, "sometimes it would hurt and [she] didn't like it." Asked why it hurt, V.M. said, "sometimes he would do it hard and other times he would put it in more and more." She said that all of the incidents happened more than once. Osorio asked V.M. if defendant asked her to touch him. V.M. replied, "um no sometimes yes and I didn't like to touch him so I didn't really touch him, I wouldn't touch him." Osorio later stated, "you also talked to me about a time that you touched his private part." V.M. responded "no," and said defendant had asked her to touch his private part, but she did not do it.

¶ 26    Officer Miracle is an evidence technician for the Elgin Police Department.[1] On February 23, 2020, Miracle was dispatched to 710 Jay Street in Elgin for evidence collection. Upon his arrival, Miracle met with Officer Edwin Alva. The officers walked through the scene to test for evidence. Miracle also met with Sanchez, V.M.'s mother. While in a bedroom of the home, Miracle directed Sanchez to locate some of V.M.'s clothing. Wearing gloves, Sanchez removed from a hamper a pair of girl's jeans, a pair of girl's underwear, and a girl's shirt. Miracle photographed

---

[1] Officer Miracle did not provide his first name.

the items, placed them in individual paper bags, and sealed the bags. He then submitted the items to the evidence locker at the Elgin Police Department.

¶ 27    David Smith is a criminal investigator and child forensic interviewer for the Kane County State's Attorney's Office who is assigned to the Child Advocacy Center. Smith testified that in February 2020, the Child Advocacy Center began an investigation of defendant. On February 23, 2020, Smith contacted defendant. Smith interviewed defendant with the assistance of Officer Alva, who acted as a Spanish-language interpreter. Smith also testified that on March 9, 2020, he executed a search warrant for buccal swabs of defendant. Smith took sealed evidence bags containing the buccal swabs to the evidence room at the Elgin Police Department for further processing.

¶ 28    Officer Alva testified that he assisted Officer Miracle with evidence collection at 710 Jay Street in Elgin. Alva recounted that the officers directed Sanchez to identify and hand over any clothing V.M. wore on Thursday, which was the night before she reported the incidents to Sanchez. Sanchez complied with the request. Alva further testified that he acted as the translator during Smith's interview with defendant. Alva testified that People's Exhibit No. 22 was an accurate English transcript of the interview. The jury was shown a video of the interview and given copies of the English transcript.

¶ 29    The transcript of defendant's interview shows that defendant initially provided preliminary information, including his date of birth (March 4, 1974). Smith then related to defendant that V.M. had told them what happened, tests "were done," and he believed V.M. was telling the truth. Smith asked defendant for his side of the story. Defendant said that sometimes he and V.M. would lay by each other while watching a movie and he would "grab her leg or her foot." Asked if he ever touched V.M.'s vagina, defendant responded that if he did, "it was an accident." Asked for a

specific incident, defendant said he could not provide one and said it was "possible" that he "could have brushed up against it." Smith questioned defendant further, and defendant described one incident:

> "[O]nce, we were upstairs playing and honestly I did touch her and she was like hey and I was like sorry and she said she was going to tell her mom and [I] did make a mistake and I didn't tell her mom about it and I told her not to tell her mom because this is a big problem you know but I never thought it would turn out to be like this."

In response to follow-up questions, defendant said the incident happened less than a month prior, he touched V.M. with his hand, and the touching was over her underwear. Smith asked defendant about an incident on Thursday. Defendant replied, "Any other day." Smith asked what happened on Wednesday. Defendant responded, "What?" Smith then asked defendant to tell him "what happened the last time [he] touched [V.M.]." Defendant said, "[t]he last time was about a month ago we were playing in the room, [the other children] were there, we would play rough and I didn't notice I touched her and that's when she told me that I had touched her that was one of the last times it happened[.]"

¶ 30    Smith asked defendant to describe "the other times." Defendant responded that he could not describe any other times. He then proceeded to explain in detail his evening routine of coming home from work, feeding the children, playing with the children, and putting the children to bed. In so doing, defendant reiterated that when V.M. watches television, "sometimes she lays down and is kicking me[,] I'm watching TV and I'm grabbing her legs and that's our routine." Smith inquired further, but defendant did not make any other statements related to the alleged offenses.

¶ 31    Leslie Frake is a forensic biologist at the Illinois State Police Forensic Science Laboratory in Rockford. In this capacity, Frake receives evidence, processes it for biological stains, prepares

a report of her findings, and testifies in court as needed. Frake testified that semen is the male reproductive fluid. The presence of semen on an object is determined through a series of three tests: (1) a presumptive chemical test to detect "acid phosphatase," an enzyme found in high concentrations in semen; (2) a presumptive chemical test to detect "p30," a protein found in high concentrations in semen; and (3) a confirmatory microscopic sperm search. On or about June 5, 2020, Frake conducted the three tests on a pair of underwear she received for examination in this case. Frake testified that the two presumptive tests were positive, establishing that "[s]emen was indicated." However, no sperm was observed under the microscope. After completing these tests, Frake sent a cut-out portion of the underwear to a colleague for further testing.

¶ 32    On cross-examination, Frake testified that p30 is found in bodily fluids other than semen. She also acknowledged that any test could have a false positive and that the testing she performed cannot determine when or how genetic material was deposited onto an object. Frake explained that Locard's Principle provides that any time two objects come into contact with one another, each object will transfer a portion of itself onto the other. She agreed that if articles of clothing in a hamper touch each other, Locard's Principle is "at play." Frake was also asked about the transference of DNA. Specifically, she was asked if someone puts on gloves, picks up an article of clothing, puts it down, and picks up another article of clothing, whether DNA from the first article of clothing would get on the gloves and be transferred to the second article of clothing. Frake responded that it is "possible."

¶ 33    On redirect-examination, Frake testified that sperm is not always found in semen. She explained that it is possible for semen to be present without sperm if it came from a man who has a low sperm count or had a vasectomy, if the sample was old or degraded, or if a spermicide was

used. She also testified that while "possible," false positives are not "plausible" given the precautions taken in the laboratory and the sensitivity of the administered tests.

¶ 34   Laurie Lee testified that she is a forensic scientist in the DNA section of the Illinois State Police Forensic Science Laboratory in Rockford. Lee's duties involve receiving and examining evidence, issuing reports on her findings, and testifying in court. Lee tested items submitted to the laboratory involving V.M. and defendant. Among these items were the sexual assault kit administered to V.M., the buccal swabs taken from defendant, and V.M.'s underwear. Lee created a DNA profile from defendant's buccal swabs. Lee testified that there was no male DNA on either the oral or vaginal swabs taken from V.M. as part of the sexual assault kit. Lee testified that a stain was extracted from V.M.'s underwear and she analyzed the DNA on the sample. She found a mixture of female and male DNA, but the amount of male DNA was so small that it was not suitable for autosomal short tandem repeat (STR) analysis. Lee therefore repackaged the sample from the underwear and sent it to another lab for Y-STR analysis, which is a test to determine the presence of Y (male) chromosomes. On cross-examination, Lee acknowledged that contamination could occur with DNA testing and analysis. She also admitted that DNA testing cannot determine when or how genetic material is transferred to a particular object.

¶ 35   Kelly Krajnik is a forensic biologist for the Illinois State Police Forensic Science Laboratory in Joliet. Krajnik testified that her primary duties involve the detection and analysis of bodily fluids on evidence, including Y-STR testing. Krajnik described Y-STR analysis as a "type of testing [that] only targets the Y chromosome," which is specific to males. She testified that Y-STRs differ from male to male, but noted that Y chromosomes are passed from father to son in their entirety from generation to generation. Thus, Y-STR analysis does not "uniquely identify an individual like standard DNA testing" because all men in the same paternal line have identical Y

chromosomes. Krajnik testified that to perform Y-STR analysis on a sample, she uses polymerase chain reaction to amplify the DNA on "specific areas on that Y chromosome." This generates a Y-STR profile from the sample to use for comparison against a known standard from an individual to determine if the DNA profiles are the same. She then determines whether the person is "included," meaning he "could have contributed the DNA in the sample," or "excluded," meaning he "could not have contributed the DNA." If the person is included as a possible contributor, she applies a statistic to determine how common or how rare that Y profile is in the general population.

¶ 36    Krajnik testified that she conducted DNA analysis in the case involving V.M. and defendant. Krajnik was given extracts from two samples—a pair of girl's underwear and a standard from defendant. Krajnik obtained a male profile from the underwear and from the standard. She then compared the two to see if defendant was included or excluded as a possible contributor to the male profile in the underwear. Krajnik testified that the results showed that "it is 800 times more likely that the defendant or [a] male paternal relative is the contributor to the sample than *** an unrelated random person in the population."

¶ 37    On cross-examination, Krajnik acknowledged that a Y-STR profile was "not as rare" as an autosomal profile generated in STR DNA analysis. She stated that a Y-STR test cannot identify a particular person. She explained that the statistic is generated using a database of "pooled males." She elaborated that "the profile goes in and it's searched to see if that profile, that male profile, has been seen in the general population before." She stated that a "95 percent confidence interval" is then applied "to make sure that we're not going to overstate how rare the profile is expected to be seen in the general population." Asked if she agreed that 1 in 1500 males have the same Y profile even if not in the paternal lineage, Krajnik responded that she could not answer the question generally and "would actually have to search that in the database."

¶ 38    Following the close of the State's case in chief, defendant moved for a directed verdict on all counts. The trial court granted the motion with respect to counts V and VIII on grounds that the State's evidence was inadequate to prove that defendant committed multiple acts of anal and oral penetration. The court denied the motion with respect to the remaining counts. The defense entered several photographs of the family's bedroom into evidence and rested.

¶ 39    During closing argument, the State argued that it had proven each and every count against defendant beyond a reasonable doubt. The State argued that V.M.'s statements to Sanchez, Osorio, and other individuals credibly indicated that the charged offenses occurred. The State also argued that the physical evidence supported a verdict of guilty, stating:

"[W]e also have the fact that [V.M.]'s underwear was recovered out of her hamper. And that stain is a semen stain where the defendant cannot be excluded.

800 times more likely that it would be the defendant. 800 times. Beyond a reasonable doubt we know that this is his semen in her underwear. And we know exactly how that semen got directly into the crotch of her underwear."

In her closing argument, defense counsel stated that Y-STR corresponded with male lineage, which would not only be defendant, but also his brother, father, and son. She also questioned whether there was semen on V.M.'s underwear, stating:

"So there is a benefit of doubt, kids [*sic*] underwear, did it really have this seminal fluid. And that's a crotch area stain the State wants you to believe. But the expert told them, well, this sample has too much of female genetic materials [*sic*]. We have to send it away. Because it is girls [*sic*] underwear. If it's urine stain, nothing. Put the DNA evidence in context."

In rebuttal closing argument, the State asserted that it did not have to prove the presence of semen or defendant's DNA. The State continued:

> "The science in this case does tell you that we have the defendant's semen and we have his DNA on the inside crotch of [V.M.]'s underwear. And we know why there was no evidence found on the sexual assault kit. Because the defendant told her to shower, to go to the bathroom afterwards, and to clean up. And that's what she did.
>
> This isn't a who-done-it case either. There's only one other male in that household. And that male is a 4-year-old boy, [V.M.]'s brother.
>
> So is the defendant the most unluckiest [*sic*] person that his DNA and his semen are to be found in the inside crotch of [V.M.]'s underwear, or we're to believe that that DNA or semen is his 4-year-old son's? Let's use our common sense."

The State further argued that the jury should discredit V.M.'s statement that nothing "came out of" defendant's penis during the incidents because, given her age, V.M. was unlikely to know if defendant ejaculated.

¶ 40    After closing arguments, the trial court instructed the jury. Following deliberations, the jury found defendant guilty of six counts of predatory criminal sexual assault of a child (counts I, II, III, IV, VI, and VII) and one count of aggravated criminal sexual abuse (count X).

¶ 41                         D. Posttrial Proceedings and Sentencing

¶ 42    Defense counsel filed a posttrial motion that raised several issues, but none relating to the State's opening statement, closing argument, or rebuttal closing argument. The trial court denied the motion. Following a sentencing hearing, the trial court sentenced defendant to a term of seven years' imprisonment on each of the predatory-criminal-sexual-assault convictions and a term of three years' imprisonment on the aggravated-criminal-sexual-abuse conviction. All sentences were

ordered to be served consecutively, thereby resulting in an aggregate sentence of 45 years' imprisonment. Defendant filed a motion to reconsider sentence, which the trial court denied. This appeal ensued.

¶ 43                                    II. ANALYSIS

¶ 44       On appeal, defendant argues that his convictions should be reversed and the case remanded for a new trial because the prosecution misstated the evidence during its opening statement, its closing argument, and its rebuttal closing argument by asserting that defendant's semen and DNA were found on V.M.'s underwear where the testimony at trial did not support such assertions. Defendant, however, neither objected to the State's remarks nor did he raise these alleged errors in a posttrial motion. See *People v. Glasper*, 234 Ill. 2d 173, 203 (2009) (noting that to preserve an issue for appellate review, a party must both object at trial and include the issue in a posttrial motion); *People v. Williams*, 2022 IL App (2d) 200455, ¶ 85 (same). As such, they are forfeited. *People v. Sebby*, 2017 IL 119445, ¶ 48. Defendant acknowledges these claims were not preserved for appeal, but seeks review under the plain-error doctrine.

¶ 45       The plain-error doctrine permits a reviewing court to consider an unpreserved error when a clear or obvious error occurred and either (1) the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) the error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence. *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). Under either prong, the burden of persuasion rests with the defendant. *People v. Sargent*, 239 Ill. 2d 166, 190 (2010). The initial analytical step under either prong of the plain-error doctrine is to determine whether there was reversible error in the first instance, because, without such error, there can be no plain error. *People v. Cosby*, 231 Ill. 2d

262, 273 (2008); *People v. Sims*, 192 Ill. 2d 592, 628 (2000); *People v. Camacho*, 2018 IL App (2d) 160350, ¶ 38. Prior to examining whether the State's remarks constituted reversible error, we address the appropriate standard of review.

¶ 46     Defendant argues that we should apply a *de novo* standard of review to assess the propriety of the State's opening statement and closing argument. However, as the State correctly observes, the standard for reviewing opening and closing remarks is not clear. *People v. Williams*, 2020 IL App (1st) 163417, ¶ 41 (observing that Illinois courts have applied differing standards in reviewing a prosecutor's opening statement); *People v. Burman*, 2013 IL App (2d) 110807, ¶ 26 (recognizing that appellate courts are divided on the applicable standard of review for closing argument). In reviewing the propriety of an opening statement, Illinois courts have used both an abuse of discretion standard (see, *e.g.*, *People v. Trotter*, 2015 IL App (1st) 131096, ¶ 43; *People v. Deloney*, 359 Ill. App. 3d 458, 470 (2005)) and a *de novo* standard (see, *e.g.*, *People v. Jones*, 2016 IL App (1st) 141008, ¶ 23)). Similarly, Illinois courts have applied differing standards of review when addressing the propriety of closing arguments. See, *e.g.*, *People v. Wheeler*, 226 Ill. 2d 92, 121 (2007) ("Whether statements made by a prosecutor at closing argument *** warrant a new trial is a legal issue this court reviews *de novo*."); *People v. Blue*, 189 Ill. 2d 99, 128 (2000) (applying an abuse of discretion standard in reviewing State's remarks during closing argument); *Deloney*, 359 Ill. App. 3d at 470 ("The character and scope of an attorney's *** closing arguments are generally left to the circuit court's discretion."). Because we would reach the same result under either standard in this case, we refrain from discussing the applicable standard of review until our supreme court resolves the conflict. *People v. Ealy*, 2015 IL App (2d) 131106, ¶ 76.

¶ 47                                       A. Opening Statement

¶ 48     We first address the propriety of the State's opening statement. "[T]he purpose of an opening statement is to apprise the jury of what each party expects the evidence to prove." *People v. Leger*, 149 Ill. 2d 355, 392 (1992). The opening may involve a discussion of the evidence and any reasonable inferences from the evidence. *Leger*, 149 Ill. 2d at 392. Remarks or argument by counsel which extend beyond the proper scope of opening statement constitute reversible error only where the remarks are attributable to deliberate misconduct of the prosecutor and result in substantial prejudice to the defendant (*People v. Smith*, 141 Ill. 2d 40, 64 (1990)) such that it is impossible to say whether a verdict of guilty resulted from the remarks (*People v. Harris*, 2017 IL App (1st) 140777, ¶ 59).

¶ 49     During its opening statement, the State told the jury that the police went to V.M.'s home to collect her underwear and that "inside the crotch area of 9-year old [V.M.'s] underwear was the defendant's semen and DNA." Defendant argues that the State's remark misstated the evidence and deprived him of a fair trial because the testimony from the State's experts did not support a claim that either semen or defendant's semen and DNA was found on V.M.'s underwear. The State counters that the complained-of remarks were based directly on the evidence presented at trial, or, at the bare minimum, constituted a reasonable inference derived from the evidence.

¶ 50     The testimony of Leslie Frake, a forensic biologist, established that the presence of semen is determined through a series of three tests. The first and second tests are presumptive. In this case, those two presumptive tests on the stain from the underwear "indicated semen," but the confirmatory microscopic analysis did not reveal sperm, which could be the result of "low sperm counts in men, a vasectomy, an old sample, any kind of degradation of sample, spermicides." While the expert witness said the results "indicated semen" and did not affirmatively state that the

material collected from the underwear was semen, that was a reasonable inference drawn from the evidence presented at trial. In this regard, the record establishes that V.M. told Sanchez (her mother) that she had been sexually assaulted by defendant. V.M. indicated to several individuals that the most recent occurrence happened on a Thursday, the night before she reported it to Sanchez. A couple of days after V.M. reported the incidents, the police went to V.M.'s home and asked Sanchez to identify and hand over any clothing V.M. wore that Thursday. Using gloves, Sanchez retrieved from a hamper various articles of V.M.'s clothing, including a pair of underwear. Given the other evidence, if believed, it would be reasonable to conclude that the stain was semen.

¶ 51     Additionally, the word "indicate" is defined as "to show the probable presence or existence or nature or course of: give fair evidence of: be a fairly certain sign or symptom of: reveal in a fairly clear way[.]" Webster's Third New International Dictionary 1150 (2002). Considering this definition, the results of the presumptive chemical tests provided reasonable grounds for the State to suggest that semen was found on V.M.'s underwear. The fact that the confirmatory test was negative does not alter our conclusion. The confirmatory test was negative for sperm, not semen. As Frake explained, semen may be present without sperm if a man's sperm count is low, the man had a vasectomy, the sample is old or degraded, or a spermicide was used. We therefore reject defendant's contention that Frake's testimony does not support the claim that semen was found on V.M.'s underwear.

¶ 52     But the State also told the jury that the semen and DNA found on V.M.'s underwear were defendant's. Initial testing of the stain extracted from V.M.'s underwear showed that it contained a mixture of female and male DNA. The amount of male DNA was so small that it was unsuitable for autosomal STR DNA analysis, and the underwear sample was forwarded to a different lab to perform additional testing for the presence of Y (male) chromosomes. Forensic biologist Krajnik

testified that Y-STR testing of a male profile extracted from V.M.'s underwear and a standard taken from defendant showed that "it is 800 times more likely that the defendant or [a] male paternal relative is the contributor to the sample than *** an unrelated random person in the population." The evidence also showed that the only other male paternal relative living in V.M.'s house when the police collected the underwear was defendant's son, who was V.M.'s brother. V.M. testified that her brother was six years of age at the time of trial in 2022, so he would have been four years old in 2020, when the most recent incident occurred.

¶ 53    Despite the probability cited by Krajnik coupled with the fact that the only other male paternal relative of defendant living in the household was defendant's four-year-old son, we believe it was error to represent to the jury in opening statement that the semen and DNA were defendant's. In *People v. Linscott*, 142 Ill. 2d 22 (1991), our supreme court held that where an expert testified that hairs found at the scene of the crime were "consistent" with the defendant's hair, it was improper for the State to argue in closing to the jury that the hair was the defendant's. *Linscott*, 142 Ill. 2d at 30. *Linscott* reversed and remanded, but in that case, a pretrial colloquy revealed the prosecutor was aware of case law finding similar statements improper, and other errors compounded the misrepresentation. *Linscott*, 142 Ill. 2d at 31. Although we agree that calling the semen and DNA defendant's misstated the evidence, we do not believe this brief, isolated comment was sufficiently prejudicial to require reversal. Additionally, the jury was advised by the trial court twice that neither opening statements nor closing arguments were evidence. There is a strong presumption that jurors follow the instructions given by the court. *In re Detention of Lieberman*, 379 Ill. App. 3d 585, 605 (2007) (providing that instruction limiting the jury's use of testimony about past crimes was presumed to have been followed); *People v. Risper,* 2015 IL App (1st) 130993, ¶ 47 (finding this same instruction cured any prejudice due to

State's reference in opening statement to evidence not proved up in trial). We find no basis for believing that this error resulted in substantial prejudice.

¶ 54                          B. Closing Argument and Rebuttal Closing Argument

¶ 55    We next address the propriety of the State's closing argument and its rebuttal closing argument. The purpose of a closing argument is to allow a party to review the evidence presented at trial, discuss the applicable law, and argue why the law and evidence compel a verdict in its favor. *People v. Nicholas*, 218 Ill. 2d 104, 121 (2005). The State is afforded wide latitude in making its closing argument. *Blue*, 189 Ill. 2d at 127. During closing argument, the State may comment on the evidence and any reasonable inference arising from the evidence (even if the inferences are unfavorable to the defendant) and may respond to comments made by defense counsel that clearly invite a response. *People v. Hudson*, 157 Ill. 2d 401, 441 (1993); *Camacho*, 2018 IL App (2d) 160350, ¶ 39. When reviewing a closing argument for error, we consider the argument as a whole rather than focusing on a few select remarks. *Camacho*, 2018 IL App (2d) 160350, ¶ 39. For a court to find reversible error based on closing arguments, the defendant must identify those remarks that were improper and so prejudicial that justice was denied or that the verdict of the jury may have been caused by the error. *Camacho*, 2018 IL App (2d) 160350, ¶ 39. In other words, if the jury could have reached a contrary verdict had the improper remarks not been made or the reviewing court cannot say that the State's improper remarks did not contribute to the defendant's conviction, a new trial should be granted. *Wheeler*, 226 Ill. 2d at 123.

¶ 56    *People v. Jackson*, 2018 IL App (5th) 150274, is instructive. In *Jackson*, the defendant's murder conviction was affirmed on review, despite three assertedly improper closing arguments by the prosecutor. See *Jackson*, 2018 IL App (5th) 150274, ¶ 1. First, the state argued that blood found on the defendant's jeans was the victim's, although the expert testimony was that it was

"likely" the victim's blood. The court held that, where the state had acknowledged in the argument that the expert was not definitive, but offered an analogy based on the probabilities testified to by the expert, the argument gave the jurors a reason to conclude the blood was the victim's and was properly based on the evidence and reasonable inferences. *Jackson*, 2018 IL App (5th) 150274, ¶ 73. Second, the State in *Jackson* argued the DNA profile from the blood "matched" the victim's (*Jackson*, 2018 IL App (5th) 150274, ¶ 74), despite its expert's testimony that DNA never provides absolute certainty, and that the term "match" is used only in certain circumstances not present in that case (*Jackson*, 2018 IL App (5th) 150274, ¶ 75). The *Jackson* court held the use of the term "match" misstated the expert's testimony, but reversal was not warranted where the remark was "isolated" within a detailed and accurate explanation of the import of the testimony. *Jackson*, 2018 IL App (5th) 150274, ¶ 76. Finally, in rebuttal argument, in discussing fingerprint evidence admitted, the state recapitulated its fingerprint expert's testimony this way: "You heard from [the expert], a fresh print…." But the expert had said that there was no way to determine the age of a fingerprint. The court observed that the inference that the print was fresh was a reasonable one but found the argument misstated the evidence because the prosecutor told the jury it heard that from the expert and that was "not accurate." *Jackson*, 2018 IL App (5th) 150274, ¶ 79. Moreover, the misstatement was made only once in the prosecutor's discussion of the fingerprint evidence. *Jackson* found neither of the two errors were "prejudicial enough to warrant reversal even if counsel had objected, and they certainly did not rise to the level of plain error." *Jackson*, 2018 IL App (5th) 150274, ¶ 79.

¶ 57    During its closing argument in this case, the State told the jury that the police recovered a pair of V.M.'s stained underwear from a hamper in her house. The State then argued, "[a]nd that stain is a semen stain where the defendant cannot be excluded. 800 times more likely that it would

be the defendant. 800 times. Beyond a reasonable doubt we know that this is his semen in her underwear." We find that the remarks that the stain was semen and that defendant could not be excluded are supported by the testimony and urging the jury that it could conclude "beyond a reasonable doubt this is his semen" is a reasonable inference to be drawn from the evidence.

¶ 58 However, defendant argues that the State misrepresented Krajnik's testimony during closing argument because it told the jury it was "800 times more likely that [the contributor] would be the defendant," while Krajnik's actual testimony was that it was 800 times more likely that defendant *or one of defendant's male paternal relatives* was the contributor. According to defendant, this omission was particularly meaningful because the evidence established that V.M.'s underwear was recovered from a hamper that also held clothes belonging to one of defendant's paternal relatives—his four year old son.

¶ 59 We agree that this omission misstated the evidence. Nevertheless, we conclude that this was not so prejudicial that it warrants reversal. In this case, the argument that defendant contributed the material in the underwear – instead of *defendant or a male relative* – was a brief one. And given that the immediately preceding comment conceded that the scientific evidence was not conclusive in that it did not exclude defendant, we conclude it was unlikely there was any prejudice – much less substantial prejudice.

¶ 60 Finally, in rebuttal closing argument, after the defense counsel questioned whether there was semen on V.M.'s underwear, the State said:

> We don't have to prove that there was semen. We don't have to prove that defendant's DNA was there. The science in this case does tell you that we have the defendant's semen and we have his DNA on the inside crotch of [V.M.'s] underwear. ***.

This isn't a who-done-it case either. There's only one other male in that household. And that male was a 4-year-old boy, [V.M.'s] brother.

So is the defendant the most unluckiest [*sic*] person that his DNA and semen are to be found in the inside crotch of [V.M.'s] underwear, or we're to believe that the DNA or semen is his 4-year-old son's? Let's use our common sense."

As we discussed regarding the opening statement, the State's assertion that there was semen on V.M.'s underwear was a reasonable inference drawn from the scientific evidence presented at trial. And taken in its full context, the State's rebuttal argument properly urged the jury that it could infer the identity of the DNA based upon the evidence presented. Reading the State's argument in its entirety, the State acknowledged that there was another male paternal relative residing in the same household as defendant, but provided the jury a rational basis to conclude that the DNA on V.M.'s underwear was that of defendant. See *Jackson*, 2018 IL App (5th) 150274, ¶ 73.

¶ 61    In his brief, defendant contends the State's arguments "claimed Frake reached a conclusion she did not reach: that semen was present on V.M.'s underwear." But this distorts the State's argument. Unlike the prosecutor in *Jackson*, the State never said that *Frake* concluded that semen was present on V.M.'s underwear. It did argue that there was semen on V.M.'s underwear, but as we have discussed that was a reasonable inference drawn from the evidence presented at trial. Consequently, we find no error with respect to the State's rebuttal argument.

¶ 62    In conclusion, like the court in *Jackson*, we find the complained of remarks in the state's opening statement, closing argument, and rebuttal were either supported by the evidence, constituted reasonable inferences to be drawn from the evidence, or were so isolated as to not warrant reversal even if counsel had objected, and they certainly did not rise to the level of plain error.

¶ 63                              III. CONCLUSION

¶ 64     For the foregoing reasons, we affirm defendant's convictions.

¶ 65     Affirmed.